**UNITED STATES of America**

**v.**

**Louis GATTO, Sr., et al., Defendants.**

**Crim. A. No. 89–250 (SSB).**

United States District Court,
D. New Jersey.

Oct. 30, 1990.

Office of the U.S. Atty. by James C. Patton, Asst. U.S. Atty., Newark, N.J., Miles R. Feinstein, Clifton, N.J., for defendant Louis Gatto, Sr.

William J. Demarco, Wayne, N.J., for defendant Joseph Gatto.

Michael A. Querques, Orange, N.J. and (Alan L. Zegas, of counsel, West Orange, N.J.), for defendant Alan Grecco.

Peter V. Ryan, West Orange, N.J., for defendant Stefano Mazzola.

## OPINION

Reconsideration of detention orders of July 31, 1989 for defendants Joseph Gatto, Alan Grecco, and Stefano Mazzola

BROTMAN, District Judge.

This matter comes before the court on the renewed applications of defendants Joseph Gatto, Alan Grecco, and Stefano Mazzola for reconsideration of their orders of detention. For the reasons stated below, the court has reconsidered its detention decisions and now sets bail with certain stringent conditions for defendants Joseph Gatto, Alan Grecco, and Stefano Mazzola.

## I. FACTS AND PROCEDURE

### A. *Introduction*

On July 20, 1989, a federal grand jury sitting in Newark, New Jersey, returned a nine count indictment against Joseph Gatto, Alan Grecco (a/k/a Al Wolshonok), Stefano Mazzola and five other individuals, charging them with a RICO conspiracy and several other federal offenses. The court conducted detention hearings for Joseph Gatto, Grecco and Mazzola on July 27, 1989. At that time, the government moved for the pretrial detention of these defendants on the ground of dangerousness pursuant to 18 U.S.C. §§ 3142(e), (f)(2)(B). The statute provides:

> (e) Detention—If, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure ... the safety of any other person and the community, he [or she] shall order the detention of the person prior to trial....

> (f) The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) will reasonably assure ... the safety of any other person and the community in a case ...

> > (2) Upon motion of the attorney for the government or upon the judicial officer's own motion, in a case that involves ...

> > (B) a serious risk that the person will obstruct justice or threaten, injure, or intimidate or attempt to threaten, injure or intimidate, a prospective witness or juror.

*Id.*

The court detained defendants Joseph Gatto, Alan Grecco, and Stefano Mazzola after finding that each defendant was dangerous and that no condition or combination of conditions could reasonably assure the safety of the community at large or potential witnesses in this case. The detained defendants requested a *de novo* review of their detention.

## B. *The December 22, 1989 Detention Opinions and Orders*

After the detained defendants' motion for a *de novo* review of their detention, the court conducted extensive hearings on the continued detention of each of the defendants on October 19, October 26, November 9, and November 27–28, 1989. The Bail Reform Act requires the court to consider the available information concerning:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

After the detention hearings, the court made numerous findings of fact as to the dangerousness of each of these defendants.[1] The indictment describes an illegal sports gambling business and an illegal numbers gambling business allegedly run by defendants in violation of 18 U.S.C. §§ 1962(c) & (d). It alleges that defendants used violence to eliminate competition, to establish a climate of fear, and to obstruct law enforcement. In particular, the indictment points to threats made to operators of rival gambling businesses, the murder of the operator of a rival gambling business, Arthur Belli, in 1977, the murder of Vincent Mistretta in 1979 who allegedly was suspected of providing information about defendants to law enforcement, and the extortionate collection of unlawful gambling debts from Robert Lipani in 1977 and 1983, from Howard Clarke in 1982–1983, and from Anthony Stumpo in 1983–1984.

The court found that, although the crime of racketeering does not necessarily involve violence, the offenses described in the indictment to demonstrate a pattern of racketeering activity were violent crimes, and were probative of defendants' dangerousness to the community. Nonetheless, the court did not rely upon this finding alone as the indictment merely established probable cause to believe defendants committed the crimes alleged, and the government had to show dangerousness by clear and convincing evidence before the court could detain defendants. The court then turned to the specific factual allegations against Joseph Gatto, Grecco, and Mazzola order to determine whether it should continue to detain any or all of them prior to trial.

### 1. *Joseph Gatto*

The court found that Joseph Gatto was implicated in several acts of violence or intimidation, including extortionate threats to Anthony Stumpo to collect gambling debts, the disappearance/murder of the operator of a rival gambling business, Arthur Belli, and the use of threats and intimidation to take over the Belli gambling business, including being present when Alan Grecco held a knife to Anthony Stumpo's throat. Defendant Joseph Gatto presented evidence that he has been married for over twenty years and has lived in the same city during that time. The court found that Joseph Gatto was not on parole or probation at the time of his indictment, and that his prior criminal record was brief and did not include any violent crime. Nonetheless, the court found that these factors

---

1. Additional facts concerning defendants' detention can be gleaned from the detention opinion as to defendant Alan Grecco. *United States v. Gatto*, 729 F.Supp. 1478 (D.N.J.1989).

did not mitigate the nature and seriousness of the danger to potential witnesses in the case given Joseph Gatto's past use of threats and intimidation, and his implication in violent crimes such as the disappearance/murder of Arthur Belli. As a result, the court found that detention of Joseph Gatto was warranted under § 3142(a)(3) as no set of bail conditions could reasonably assure the safety of the community at large or potential witnesses in this case.

### 2. Alan Grecco

The government presented substantial evidence as to defendant Grecco's dangerousness. The court found that Grecco had used threats and intimidation to take over the Belli gambling business. The evidence showed that in the past Grecco had been heavily armed with machine guns, hand grenades, and bombs. The evidence also showed that Grecco used violence against persons whom he suspected betrayed him to law enforcement, violence which included the murders of Vincent Mistretta and Johnny Lombardi. The court found that one of Grecco's codefendants refused to cooperate with the government's investigation of this case as he feared for his life. The court found that Alan Grecco had been implicated in many violent crimes, including hijacking, robbery, arson, beatings, extortionate threats to Anthony Stumpo and Howard Clarke, the murders of Johnny Lombardi and Vincent Mistretta, and the disappearance/murder of Arthur Belli. While Grecco's prior criminal record was not extensive and he was not on parole or probation at the time of the indictment, his criminal record did include a conviction for bribery of a witness, indicating his willingness to approach trial witnesses. As a result, the court found that the nature and seriousness of the danger to potential witnesses in the case was substantial given Grecco's past use of threats and intimidation, and his implication in violent crimes such as hijacking, robbery, arson, and murder. Detention of Alan Grecco pending trial was warranted under § 3142(e) as no set of bail conditions could reasonably assure the safety of the community at large or potential witnesses in this case.

### 3. Stefano Mazzola

Stefano Mazzola had been convicted of one violent crime, armed robbery, prior to this indictment. The court found that Mazzola had been implicated in many other violent crimes including the disappearance/murder of the owner of a rival gambling business, Arthur Belli, threats to Anthony Stumpo and Robert Lipani to collect gambling debts including putting a gun in Lipani's mouth and threatening to shoot, the arson of Fisherman's Net Restaurant, the disappearance/murder of Johnny Lombardi, armed robberies and hijackings, and the murder of Peter Adamo. The court also found that Mazzola had engaged in other violent conduct and had made threats to commit violence, including an unjustified beating of Carlos Nieves, a threat to kill a prosecutor, Ray Flood, a threat to kill his stepfather, destruction of his doctor's office upon learning he would be indicted, and the staging of a machine gun attack on himself and another police officer while he was a police officer in order to obtain a reduced sentence for an associate. The court also found that psychiatrist reports regarding Mazzola indicated that he had a long history of hostile and aggressive behavior.

At the time of his indictment, Mazzola was on parole; however, he presented evidence that he had integrated himself back into the community well. The court found that Mazzola's willingness to obstruct justice was demonstrated by his participation in the staged machine gun shooting in order to assist an associate obtain a lesser sentence, and by his conviction for false swearing. As a result, the court found that the nature and seriousness of the danger to potential witnesses in the case was substantial given Mazzola's past use of threats and intimidation, and his implication in violent crimes such as hijacking, robbery, arson, and murder. The court found that detention of Mazzola pending trial was warranted under § 3142(e) as no set of bail conditions could reasonably assure the safety of the community at large or potential witnesses in this case.

#### 4. *Conclusion*

The court detained Joseph Gatto, Alan Grecco, and Stefano Mazzola pending trial, finding as to each defendant that there was no set of bail conditions which would reasonably assure the safety of the community at large or potential witnesses in this case. At the time of its detention decisions, the court noted that it would reconsider its detention decisions if the detention of defendants was prolonged beyond the schedule then existing for trial. At the time of the December 22, 1989 detention decisions, the court had set a date of January 19, 1989 for the filing of defendants' pretrial motions. At the hearing held on October 19, 1989, the Assistant United States Attorney represented that the government would be prepared to try the case within one month of receiving defendants' pretrial motions. Hence, at the time of December 22, 1989 detention decisions, it was anticipated that trial could commence on February 19, 1990 or soon thereafter.

### C. *Defendants' Pretrial Motions*

The deadline for filing pretrial motions for all defendants was originally set for January 19, 1990. That date was later extended after numerous requests for extensions of time by defendants, with the defendants ultimately filing their pretrial motions on April 27, 1990. On February 16, 1990, the court set the matter for trial on June 11, 1990, and on April 30, 1990, the court moved the trial date to July 16, 1990. On May 11, 1990, the matter was set for trial on October 1, 1990. The pretrial motions of the eight defendants raised many substantial issues. The court heard oral argument on defendants' motions on June 8, 1990, and held two evidentiary hearings on defendant Grecco's motion to suppress the statements of Frank Galimi on June 13, 1990 and July 30, 1990.

### D. *The Court's Order of September 4, 1990*

On September 4, 1990, this court entered an order with an accompanying 122–page opinion resolving most of defendants' pre-

trial motions in anticipation of the October 1, 1990 trial date.[2] In its order, the court severed the trial of defendants into two groups. One group was composed of Louis Gatto, Sr., Joseph Gatto, Alan Grecco, and Stefano Mazzola. The other was composed of Louis Gatto, Jr., Frank Camiscioli, Jr., Peter Mylenki, and William Odierno. The court also granted defendant Grecco's motion to suppress certain testimony of Frank Galimi. While the court's September 4, 1990 order and opinion resolved numerous other motions of the defendants, only the above-mentioned motions are relevant at this time as they affected the scheduling of this matter.

### E. *Conference and Oral Argument on September 19, 1990*

Following the court's September 4, 1990 order suppressing the Galimi statements, the government moved for the court to reconsider that decision or, in the alternative, to clarify it. In order to understand the importance of that decision to the government's case, it is necessary to review briefly the facts underlying the court's decision.

Racketeering act number three of count two of the indictment alleges that Louis Gatto, Sr. and Alan Grecco conspired with others to commit the murder of Vincent Mistretta who was murdered on April 26, 1979, and that an overt act in furtherance of the conspiracy was the murder of Mistretta by Grecco and another person. Frank Galimi allegedly was an eyewitness to the murder of Mistretta, and told the police at the time of the murder that the victim told him just prior to his death, "Al Wolshonak [a/k/a Alan Grecco] did it." On the night of the murder, Galimi described perpetrators to the police, but did not identify Alan Grecco as one of the men he saw running from the scene. The next day, after being interrogated throughout the night by members of the Bergen County Prosecutor's Office, Galimi visited a hypnotist at the request of the Prosecutor's Office. During the hypnosis session, Gali-

---

**2.** The issues reserved by the court were resolved by order on or before October 1, 1990.

mi for the first time said that Alan Grecco might have been one of the men he saw commit the murder. Galimi testified at hearings conducted by the court on this issue on June 13, 1990 and July 30, 1990. The court found that Galimi's identification of Grecco as the perpetrator of the murder, made only after the hypnosis session, was inadmissible at trial.

As the court's suppression decision affected one of the government's most serious allegations contained within the indictment, the government moved for reconsideration or, in the alternative, clarification of the court's order. On September 19, 1990, the court clarified its order on the record, suppressing the Galimi testimony regarding the events surrounding the murder of Vincent Mistretta only to the extent that such testimony is inconsistent with information memorialized prior to Galimi's hypnosis session on April 27, 1979. The court denied the government's motion to reconsider its suppression decision.[3] On that date, after the denial of its motion for reconsideration, the government declared its intention to appeal the suppression order of the court. On September 20, 1990, the government filed a notice of appeal, and on September 21, 1990, the United States Court of Appeals for the Third Circuit granted the government's motion to hear that appeal on an expedited basis.

The allegations contained within the indictment concerning the murder of Vincent Mistretta for which the Galimi statements (and their suppression) are relevant apply only to the first group of defendants, Louis Gatto, Sr., Joseph Gatto, Grecco and Mazzola. It was not clear to the court on September 19, 1990 whether the trial of Louis Gatto, Sr., Joseph Gatto, Grecco and Mazzola could commence on October 1, 1990, due to the pendency of the government's appeal. The court planned to try the detained defendants and Louis Gatto,

Sr. on October 1, 1990, if the Third Circuit had decided the government's appeal by that date. If the Third Circuit had not yet decided the government's appeal, the court planned to try the second group defendants composed of Louis Gatto, Jr., Camiscioli, Mylenki, and Odierno on October 1, 1990. As a result of this uncertainty, the court ordered both groups of defendants to appear ready for trial on Monday, October 1, 1990, at 9:30 a.m.

### F. Events Between September 19 and October 1, 1990

#### 1. Government's Motion for an Anonymous Jury

On Thursday, September 27, 1990, the government moved to empanel an anonymous jury for the trial of Louis Gatto, Sr., Joseph Gatto, Grecco and Mazzola. Anticipating difficulty finding jurors willing and able to sit for many months to hear this case, the court had summoned four hundred potential jurors to appear on October 1, 1990. A list of the names and addresses of the potential jurors had already been made public at the time of the government's motion. As a result, if the court had granted the government's motion in all or in part, it would have been unable to ensure the anonymity of the jury on October 1, 1990, due to the release of the potential jury list.[4]

The government's motion was filed well after the deadline set by the court for all pretrial motions. Most disturbing to the court was the fact that it had expressly asked the parties on September 19, 1990, if any additional pretrial motions were anticipated. The government did not notify the court at that time that it anticipated making the motion for an anonymous jury; instead, on Thursday, September 27, 1990, three days before the trial was scheduled

---

3. The court's order entered on the record on September 19, 1990 was formalized by written order on September 24, 1990.

4. On Friday, September 28, 1990, after being informed by chambers that the potential jury list had already been released, the government moved to seal the jury list in order to prevent its

further release. The court denied the motion as it had no way to ensure the anonymity of the jury. On October 1, 1990, counsel for Louis Gatto, Sr., Miles Feinstein, informed the court that he in fact had obtained a copy of the potential jury list.

to commence, the government simply filed its motion.

A motion for an anonymous jury is the type of motion which can be anticipated well in advance of the time it is filed. In this case, the very same allegations which have caused this court to detain defendants Joseph Gatto, Alan Grecco, and Stefano Mazzola, support the government's motion for an anonymous jury. For that reason, the court could not simply dismiss the government's motion as untimely without considering it on the merits. At the same time, the court was reluctant to decide the issue without hearing argument from defense counsel as the government's motion implicated one of the most fundamental rights provided to criminal defendants in the United States Constitution, the right to trial by an impartial jury. The motion for an anonymous jury, filed at such a late date, contributed to the delay of the trial.

### 2. Unavailability of Defendant Grecco's Counsel

The court also learned late in the week prior to the October 1, 1990 trial date that defendant Grecco's counsel Michael Querques would be unavailable on October 1st as he was in the middle of a criminal jury trial in state court. The court was informed that he would not be available until the end of the week of the October 1st or early the following week.

### 3. Conclusion

Because of the pendency of the government's motion for an anonymous jury and Mr. Querques' unavailability, it was clear by Friday, September 28, 1990 that the trial of Louis Gatto, Sr. and the detained defendants, Louis Gatto, Grecco and Mazzola, could not go forward on October 1, 1990. On Friday afternoon, the court released two hundred of the four hundred jurors who had been summoned to appear on October 1, 1990. The trial of the other group of defendants, Louis Gatto, Jr., Camiscioli, Mylenki, and Odierno, was not expected to last as long as the trial of the other group,

and, as a result, would not have required such a large potential juror panel.

### G. The October 1, 1990 Trial Date

On October 1, 1990, all counsel, save Mr. Querques, and all defendants appeared for trial. At that time, defendants Louis Gatto, Jr., Camiscioli, Mylenki, and Odierno each entered a plea of guilty to managing a gambling business in violation of 18 U.S.C. § 1955, which obviated the need for trial of that group of defendants. For the numerous reasons already mentioned above, the trial of the other group of defendants comprised of Louis Gatto, Sr. and the detained defendants could not commence on October 1, 1990. The government's expedited appeal before the Third Circuit concerning the court's suppression decision had not yet been decided, nor had the Third Circuit received complete briefing from the parties at the time of the October 1, 1990, trial date arrived.[5]

Trial will not start until the appeal of the suppression order is decided as it is not in the interest of justice for it to start prior to that time. The testimony suppressed concerns one of the government's most serious allegations against the defendants, namely, that Alan Grecco murdered Vincent Mistretta. The government cannot be faulted for appealing the suppression decision and has every right to do so. 18 U.S.C. § 3731. Until the resolution of the government's appeal, however, the court will not start the trial of this matter as it does not want to be in the unhappy position of stopping a jury trial to await an appellate decision. While the Third Circuit has granted an expedited appeal which it will resolve quickly and thoroughly, the Third Circuit's decision may not be the final one in this matter. It is possible that the government could seek en banc review of the issue or appeal to the United States Supreme Court if the Third Circuit affirms this court.

The pendency of the government's appeal alone would have caused the court to delay the trial; however, there were nu-

---

**5.** Defendants informed the court that they were unable to submit full appellate papers on this issue prior to the October 1, 1990, due to the Jewish holidays and the illness of Mr. Zegas' father.

merous other considerations which, in the interest of justice, caused the continuance of the trial date of this matter to February 4, 1991. First, Mr. Querques, counsel to defendant Grecco, was unavailable to start trial on October 1, 1990. It was anticipated that he would be unavailable for a week or longer. In addition, as previously noted, the government moved for an anonymous jury just days before the scheduled trial date. The same allegations which support the court's findings of dangerousness of these defendants were also urged to support the government's motion to empanel an anonymous jury. While the court has not yet considered the merits of that motion, the motion must be examined carefully, and defense counsel must have the opportunity to respond. Defense counsel represented that they needed additional time to brief the suppression issue before the Third Circuit, and requested until Friday, October 19th to file their responsive papers to the government's motion before this court for an anonymous jury. In the interest of justice, the court granted defense counsel until that date to file opposition to the government's motion. The government's reply papers were due Monday, October 22, 1990.[6] This court will hear oral argument on the motion after that date if, after examining the parties' papers, it believes oral argument is warranted.

Finally, it was abundantly clear on October 1, 1990, that the government, despite its protestations to the contrary, was not prepared to proceed. For example, the court had ordered the government to produce Frank Schneider to defense counsel so they could ask Schneider to speak with them. As of October 1, 1990, the government had not yet produced Schneider. The court ordered the government to do so within three weeks of the October 1, 1990 trial date. Defense counsel had requested the government to bring its trial exhibits to a location where they could be reviewed by the detained defendants and their counsel. That had not been done as of October 1,

1990.[7] In the week prior to the October 1, 1990 trial date, the government provided defense counsel with "what [it] hope[s] are final drafts ..." of transcripts of tapes in this matter. Transcript of October 1, 1990, at 14. If the transcripts of the tapes were not complete at the time of the October 1, 1990 trial date, it is not unreasonable to infer that the government was not ready for trial on that date. When the transcripts do become final, defendants will need time to review them. Finally, in September of 1990, the government revealed to defense counsel for the first time that it possessed fifteen years worth of surveillance logs concerning these defendants. For all of the above reasons, it difficult to believe that the Government was ready a year ago to try this matter within a month of receiving the defendants' pretrial motions. While the court does not place all of the blame for the delay of this trial on the government as its appeal is still pending and defendants asked for many extensions of time prior to the filing of their pretrial motions, the government has played a role in the delay of this matter.

In sum, in the interest of justice, this trial was continued to February 4, 1991, in order to resolve these remaining matters. Once the motion for an anonymous jury is resolved, the parties need to implement an efficient procedure to select the jury in this matter. It is not in the interest of justice for the court or the parties to spend months creating a methodology to select the jury while 400 jurors wait in the courthouse.

The further delay of the trial is of great concern as defendants Joseph Gatto, Grecco and Mazzola have been detained since July 27, 1989, a lengthy period which implicates defendants' constitutional due process rights. At the time of its last written detention decisions, the court anticipated that defendants' trial would commence as early as February 19, 1990. The trial date eventually was set for June 11, 1990, then

---

**6.** The government requested only a single day to file its response.

**7.** Once the court continued the trial to February 4, 1991, the review of the government's exhibits occurred in this court's courtroom on or about October 2–3, 1990.

was adjourned to July 16, 1990, and was adjourned again to October 1, 1990. The trial of defendants has been continued to the new, firm date of February 4, 1991 in the interest of justice, almost one full year after the first date the case could have been ready for trial. As a result of this lengthy delay before the detained defendants' trial, the court must reconsider of the detention of Joseph Gatto, Alan Grecco, and Stefano Mazzola pending trial.

Defendants make two arguments concerning their continued detention. First, they argue that additional information they have uncovered in their investigation demonstrates that the court's determination that defendants are dangerous is erroneous. Defendants argue that the court's findings that are supported by attenuated hearsay, government proffers, and unreliable information which can be refuted by them if granted a new detention hearing. The defendants posit that many of the government's witness are incredible. For example, defendants proffer that Frank Schneider, who allegedly implicates defendants in the murder of Arthur Belli, is a drug addict, has admittedly lied to law enforcement officials in the past to receive more favorable treatment, and is currently serving a life sentence. Defendants argue that these facts indicate Schneider is not to be believed. Defendants also assert that several prosecution witnesses, such as Anthony Stumpo, have approached defense counsel which indicates that these witnesses are not afraid of defendants. Second, defendants argue that their detention, even if initially justified on the ground of dangerousness, has at this time become punitive, violating their constitutional due process rights. Defendants argue for bail at this time, and agree to be subject to any conditions the court imposes, including conditions of house arrest with electronic surveillance and wiretaps on their telephones, the same bail conditions as Louis Gatto, Sr. has had for the last fifteen months.

In response, the government argues that none of the information defendants have proffered has altered the finding that defendants are dangerous, and notes that many of the same arguments concerning the credibility of the government's witnesses, including the credibility of Frank Schneider, were previously made and rejected. The government argues the fact that Anthony Stumpo has approached defense counsel indicating that he is not afraid of defendants may mean exactly the opposite, that he does indeed fear them. The government also asserts that due process does not require the release of defendants at this time.

## II. DISCUSSION

When considering a constitutional due process challenge to lengthy pretrial detention, the Court of Appeals for the Third Circuit recognized that "at some point due process may require a release from pretrial detention. . . ." *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir.1986). Numerous other circuits have also so held. *See e.g. United States v. Hare*, 873 F.2d 796, 801 (5th Cir.1989); *United States v. Ojeda Rios*, 846 F.2d 167 (2d Cir.1988); *United States v. Portes*, 786 F.2d 758, 768 (7th Cir.1985); *see also United States v. Zannino*, 798 F.2d 544, 548–49 (1st Cir. 1986). In the American criminal justice system, defendants are presumed innocent until proven guilty. In such a system, "valid pretrial detention assumes a punitive character when it is prolonged significantly." *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir.1986). A defendant who ultimately may be acquitted can be detained for months or even years under the Bail Reform Act, raising substantial due process concerns.[8] This court is legitimately concerned about the lengthy detention of these defendants prior to trial.

■■■ As an initial matter, it must be noted that no further analysis would be necessary if the earlier findings of defendants' dangerousness were erroneous. Most of defendants' arguments concerning

---

**8.** For example, some of the *Accetturo* defendants were detained prior to trial for an extended length of time, and after a twenty-one month jury trial, all twenty defendants were acquitted on all charges. *See* Reed, The Defense Case for RICO Reform, 43 Vand.L.Rev. 691, 719 (1990).

their dangerousness were previously raised and rejected, and do not merit further discussion. None of defendants' additional arguments persuade the court that its determination of dangerousness as to each defendant was erroneous. Defendants argue, for example, that Anthony Stumpo has approached defense counsel, indicating that he is not afraid of defendants. Defendants wish the court to conclude from Stumpo's behavior and statements that Stumpo is not afraid of defendants. Stumpo's behavior and statements, however, are inconclusive. Stumpo could just as easily represent to defendants that he is not afraid of them in order to protect himself because he *is* afraid of them. The court stands by its earlier findings that defendants are dangerous. This determination, however, does not end the inquiry. Despite defendants' dangerousness, the issue which must be resolved is whether the due process clause requires bail be set for these defendants at this time.

■ The due process clause of the fifth amendment of the United States Constitution prohibits the imposition of punishment prior to trial. *Bell v. Wolfish,* 441 U.S. 520, 535 and n. 16, 99 S.Ct. 1861, 1872 and n. 16, 60 L.Ed.2d 447 (1979). At the same time, the Bail Reform Act of 1984 allows the district court to detain certain defendants prior to trial on the ground of future dangerousness, as well as on other grounds. The provision of the Bail Reform Act allowing pretrial detention on the ground of dangerousness withstood a facial constitutional challenge under the due process clause in *United States v. Salerno,* 481 U.S. 739, 752, 107 S.Ct. 2095, 2104, 95 L.Ed.2d 697 (1987). The Supreme Court found that the pretrial detention permitted under the Bail Reform Act constituted a permissible regulation of liberty rather than impermissible punishment. *Salerno,* 481 U.S. at 747, 107 S.Ct. at 2101.

In most cases, the provisions of the Speedy Trial Act, codified at 18 U.S.C. § 3161 *et seq.,* protect defendants from lengthy pretrial detention. The Speedy Trial Act provides that a detained defendant must be tried within 90 days of his arraignment with certain time excludable. 18 U.S.C. §§ 3161(h), 3164. Congress considered and rejected a statutory time limitation for pretrial detention under the Bail Reform Act, partially in reliance upon the protection offered by the Speedy Trial Act. *See* Note, *United States v. Salerno:* "A Loaded Weapon Ready For the Hand", 54 Brooklyn L.Rev. 171, 206 n. 207 (1988) *citing* S.Rep. No. 225, 98th Cong., 2d Sess. 22 n. 63 ("These current limitations [of the Speedy Trial Act] are sufficient to assure that a person is not detained pending trial for an extended period of time."); Alschuler, Preventive Pretrial Detention and the Failure of Interest–Balancing Approaches to Due Process, 85 Mich.L.Rev. 510, 516 (1986) (senators supporting Bail Reform Act erroneously believed 90 days was " 'upper bound' or 'worst case limit' " to pretrial detention).

Due to the unusual nature and complexity of this case, in the interest of justice much time has been excluded under the Speedy Trial Act. As a result, it is now late October, 1990, some fifteen months after defendants' arraignments, and trial is not scheduled to start until February 4, 1991, over eighteen months after defendants' arraignments, a period significantly longer than the 90–day "limit" of pretrial detention contemplated under the Bail Reform Act. 18 U.S.C. § 3164.

*Salerno* did not resolve the issue of whether the Bail Reform Act could be unconstitutional as applied. In *Salerno,* the Supreme Court noted that there was no such argument before it, *Salerno,* 481 U.S. at 745, n. 3, 107 S.Ct. at 2100, n. 3, and expressly stated that it "intimate[d] no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." *Id.,* 481 U.S. at 747, n. 4, 107 S.Ct. at 2102, n. 4. This court, therefore, is free to consider whether the detention of defendants has become punitive under the due process clause, requiring the defendants' release from pretrial detention at this time.

■ There is no magical formula to determine precisely when the continued pre-

trial detention of a defendant becomes punitive and therefore violative of due process. Due process is necessarily a flexible concept. In order to determine whether due process requires these defendants to be granted bail at this time, the court must consider the "seriousness of the charges, the strength of the government's proof that defendant[s] pose[ ] a risk of flight or a danger to the community, ... the strength of the government's case on the merits[,] ... the length of detention that has in fact occurred, the complexity of the case, ... whether the strategy of one side or the other has needlessly added to the complexity...." as well as other factors. *Accetturo*, 783 F.2d at 388. Those factors which bear on the "fundamental fairness" of the continued pretrial detention of the defendants must be examined. *Accetturo*, 783 F.2d at 395 (Sloviter, J., dissenting in part).

### A. *Seriousness of the Charges and Strength of the Government's Proof of Dangerousness*

This court notes initially that the charges in the indictment are serious and include several predicate acts of violence including murder. In addition, the offenses charged here do not raise the statutory presumption of 18 U.S.C. § 3142(e) that presumes that no condition or combination of conditions will reasonably assure the safety of the community; rather, the government produced evidence at the hearings to demonstrate clearly and convincingly that defendants are dangerous. The specific findings of the court are listed above. The seriousness of the charges and the strength of the government's proof of dangerousness weigh against defendants' release at this time.

### B. *Strength of the Government's Case on the Merits*

Many of the allegations against defendants concern events which occurred many years ago, and the charges of violence in the indictment are quite old. The murder of Arthur Belli occurred in 1977, the alleged extortionate collection of debts from Lipani occurred in 1977 and 1983, the murder of Vincent Mistretta occurred in 1979, the alleged extortionate collection of debts from Clarke occurred in 1982–1983, and the alleged extortionate collection of debts from Stumpo occurred in 1983–1984. Generally, it is difficult for the government to prove beyond a reasonable doubt allegations concerning crimes over ten years old, and there may be particular difficulty in this case.

At the time of the initial detention hearings, the government's case appeared very strong. After further acquaintance with the government's case and upon further reflection, the strength of the government's case on the merits appears much weaker. Although the government's case concerning the illegal gambling business is strong, its evidence regarding the crimes of violence is much less substantial and appears to be stale in many instances. The body of Arthur Belli, who disappeared in 1977, was never recovered. Frank Galimi, the prime witness in the Mistretta murder, testified at a suppression hearing this summer. His testimony was not overly impressive. Defendants would not have been detained based on the evidence of their involvement in an illegal gambling business alone. This factor weighs in favor of the defendants' release at this time.

### C. *Length of Defendants' Detention*

The length of defendants' pretrial detention in this case is substantial. Defendants have now been detained fifteen months pending trial and their trial date is over three months away. The government estimates that the trial of these defendants will take three months; defendants suggest that their trial will last at least six months and perhaps over a year. If this court accepts the conservative estimate of the government as to the length of this trial, Joseph Gatto, Alan Grecco, and Stefano Mazzola will be detained twenty-one months before a jury adjudicates their guilt. If defense counsel's estimate is correct, defendants may be detained close to three years before a jury renders a verdict.

The length of the detention is critical due to the "crucial liberty interest at stake." *United States v. Suppa*, 799 F.2d 115, 120 (3d Cir.1986). *See also United States v. Perry*, 788 F.2d 100, 114 (3d Cir.), *cert. denied*, 479 U.S. 864, 107 S.Ct. 218, 93 L.Ed.2d 146 (1986) ("the grave invasion of the most fundamental of all personal liberties that occurs when preventive detention is ordered"). Other courts, when faced with a lengthy detention, have found a due process violation. *See Theron*, 782 F.2d at 1516–17 (4 months); *United States v. Melendez–Carrion*, 790 F.2d 984, 1008 (2d Cir.1986) (Feinberg, J., concurring) (8 months); *United States v. Gonzalez Claudio*, 806 F.2d 334, 343 (2d Cir.1986) (14 months); *Ojeda Rios*, 846 F.2d at 169 (32 months). *But see United States v. Zannino*, 798 F.2d 544, 548 (1st Cir.1986) ("in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement...." but not where defendant himself responsible for delay in trial). The non-speculative duration of defendants' detention heavily weighs in favor of their release at this time.

### D. *Complexity of the Case and Whether the Strategy of One Side or the Other Has Needlessly Added to It*

This case is complex. Defendants are charged with running illegal sports gambling and bookmaking businesses. Some of the predicate acts in this case date back to the 1970's. The government represents that there are tapes from over 200 days of court-ordered listening devices. As a result, some delay in the commencement of this trial beyond the ninety days contemplated by the Speedy Trial Act is to be expected; however, as noted above, these defendants have already been detained for fifteen months. It must be determined whether the strategy of one side or another has needlessly added to the complexity of this case.

At times, the government has acted in a manner to facilitate the speedy trial of this action. For example, the government has prepared a log of the tapes to serve as an index which will facilitate this case. At other times, the actions of the government have worked to delay the trial of this action, such as the government's eleventh hour filing of its motion for an anonymous jury. Similarly, at times defendants have worked to simplify this case. For example, the success of their motion to sever has allowed four of the eight defendants to enter guilty pleas at this time. Defendants, however, also are responsible for many of the delays in this case. They requested numerous extensions of time before filing their pretrial motions. As neither side has needlessly added to the complexity of this case, this factor neither weighs for or against defendants' release at this time.

### E. *Additional Factors*

In the instant case, one additional factor is highly relevant to the determination of whether defendants' continued detention violates the notions of "fundamental fairness which underlie due process." *Accetturo*, 783 F.2d at 395 (Sloviter, J., dissenting). During the last fifteen months, the court has had the benefit of observing Louis Gatto, Sr.'s behavior while on bail. Louis Gatto, Sr. is charged in the same RICO conspiracy as the detained defendants, and is also implicated in the acts of violence. At the time the court made its initial detention decision, the government vigorously argued against Louis Gatto, Sr.'s release, alleging that he was the head of the criminal organization engaged in the violence and intimidation. Louis Gatto, Sr. is seriously ill with cancer. Fifteen months ago, the court granted him bail with certain stringent conditions. Essentially, Louis Gatto, Sr. is under house arrest with electronic surveillance and a wiretap on his telephone.

In the fifteen months since Louis Gatto, Sr. was released on bail, there has been no serious infraction of the bail conditions or a single instance of witness intimidation or violence. Louis Gatto, Sr.'s successful compliance with his stringent bail conditions suggests that there are conditions of bail which could ensure the safety of witnesses and the community against the de-

tained defendants. Defendants Joseph Gatto, Alan Grecco, and Stefano Mazzola have consented to be subject to the same conditions as Louis Gatto, Sr. or any other appropriate conditions. Defendants' agreement to be subject to stringent bail conditions is a factor weighing for defendants' release from pretrial detention on bail. *Ojeda Rios*, 846 F.2d at 169.

In *Accetturo*, the Third Circuit suggested that "due process judgments should be made on the facts of the individual cases, and should reflect the factors relevant in the initial detention decision ..." *Id.*, 783 F.2d at 388. Under the Bail Reform Act, the ultimate inquiry in determining whether to detain these defendant prior to trial was whether "no condition or combinations of conditions will reasonably assure ... the safety of any other person and the community." 18 U.S.C. § 3142(e). After observing Louis Gatto, Sr.'s compliance with the strict bail conditions imposed upon him, it appears that imposition of the same stringent bail conditions on these defendants could reasonably assure the safety of the community against these defendants. This additional factor weighs for defendants' release on bail with stringent conditions at this time.

## III. CONCLUSION

Given the problems with the government's case on the merits, the non-speculative duration of defendants' pretrial detention which has already lasted fifteen months, Louis Gatto, Sr.'s successful compliance with the stringent bail conditions imposed upon him, and defendants' willingness to comply with similar conditions, this court finds that the continued detention of defendants pending trial would be punitive. As a result, due process requires bail with very stringent conditions be set for each of these defendants at this time.

Bail will be set at $1,000,000 for Joseph Gatto, secured by the property listed in Appendix A to the order accompanying this Opinion. The conditions to Joseph Gatto's release on bail are also listed in Appendix A. Bail will be set at $1,000,000 for Alan

Grecco, secured by the property listed in Appendix B to the order accompanying this Opinion. The conditions to Alan Grecco's release on bail are also listed in Appendix B. Bail will be set at $1,000,000 for Stefano Mazzola, secured by the property listed in Appendix C to the order accompanying this Opinion. The conditions to Stefano Mazzola's release on bail are also listed in Appendix C.

An appropriate order will be entered. The court will stay the order for one week in order to provide the government the opportunity to appeal if it so chooses.

## ORDER

This matter having come before the court on the motion of defendants Joseph Gatto, Alan Grecco and Stefano Mazzola for reconsideration of their orders of detention;

The court having considered the submissions of the parties and the arguments of counsel; and

For the reasons set forth in the court's opinion of this date;

IT IS on this 30th day of October, 1990, hereby

ORDERED that defendants' motion for reconsideration is GRANTED. Bail will be set at $1,000,000 for Joseph Gatto, secured by the property listed in Appendix A * to this order. The conditions to Joseph Gatto's release on bail are also listed in Appendix A. Bail will be set at $1,000,000 for Alan Grecco, secured by the property listed in Appendix B to this order. The conditions to Alan Grecco's release on bail are also listed in Appendix B. Bail will be set at $1,000,000 for Stefano Mazzola, secured by the property listed in Appendix C to this Opinion. The conditions to Stefano Mazzola's release on bail are also listed in Appendix C.

IT IS FURTHER ORDERED that this order is STAYED for ONE WEEK so that

* Editor's Note: Appendices A–C omitted from publication by the Court.

the government can appeal this decision if it so chooses.