**UNITED STATES of America**

v.

**Rocco Ernest INFELISE, Salvatore DeLaurentis, Robert Bellavia, and Harry Aleman.**

**Nos. 90 CR 87–1, 90 CR 87–3, 90 CR 87–4 and 90 CR 87–12.**

United States District Court, N.D. Illinois, E.D.

June 12, 1991.

Mitchell A. Mars, Jeffrey M. Johnson, Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Patrick A. Tuite, Kevin E. Milner, Chicago, Ill., Bruce Cutler, New York City, Robert A. Novelle, Serpico, Novelle, Dvorak & Navigato, Chicago, Ill., Robert F. Simone, Philadelphia, Pa., Allan A. Ackerman, Chicago, Ill., for defendants-appellants.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

Defendants Rocco Ernest Infelise, Salvatore DeLaurentis, Robert Bellavia and Harry Aleman are currently being detained at the Metropolitan Correctional Center pend-

ing their trial on racketeering charges. The government moved to have these defendants detained as soon as they were indicted in February, 1990. Magistrate Judge Rosemond granted the government's motion for detention, finding that all defendants presented a danger to the community and that defendant Aleman presented a flight risk as well. Defendants appealed to this court and, after holding hearings for each defendant, the court affirmed the Magistrate Judge's decision to detain these defendants. In its May 15, 1990 Memorandum Opinion and Order, 1990 WL 77795, the court held that the defendants' right to due process had not yet been violated and that it was too early to determine whether, if defendants were detained until the trial, their due process rights would ultimately be violated. Also, pursuant to the Bail Reform Act of 1986, 18 U.S.C. § 3142, the court went on to examine whether there were any conditions of release which would reasonably assure the safety of witnesses and the community. Although defendants had suggested a number of different conditions, including pen registers on their phones, wire taps on their phones and constant surveillance by pretrial services, the court found these conditions were not sufficient given the weight of the evidence against the defendants, their prior criminal history and the seriousness of the charges against them.

In passing, the court noted that the Northern District of Illinois did not yet have electronic surveillance bracelets available to it, while other jurisdictions did. The court stated that "if the court eventually decides defendants' due process rights are being violated, *the lack of availability of this device alone will not preclude defendants' release.*" *See* May 15 Memorandum Opinion and Order at 11 (emphasis added). By making this comment, the court did not mean to imply that as soon as the ankle bracelets became avail-

able, defendants Infelise, DeLaurentis, Bellavia and Aleman would be released. Rather, the court meant that if a due process violation was found, defendants would not be detained solely because ankle bracelets were not available. On November 30, 1990, defendants submitted a supplement to their renewed motion for pretrial detention in which they stated that they "interpreted this Court's efforts to inquire into the availability of the bracelets/anklets to mean that it considered them to be a possible alternative to detention in the present case" and they alerted the court that the devices were available in the district. Second Supplement to Renewed Motion at 2. In response, the government argued that the system was not yet functional and that even if it was, it would not be appropriate for these defendants.

In its Memorandum Opinion and Order dated January 2, 1991, 1991 WL 10831, the court denied defendants' renewed motion for release pending trial, holding that defendants had not shown a violation of their right to due process nor a violation of their right to effective assistance of counsel.[1] Regarding the electronic surveillance anklets, the court stated that "[b]ecause the court finds no due process violation at this point, investigating the availability of electronic surveillance anklets is still premature." Memorandum Opinion and Order, January 2, 1991 at 10. The reason the court thought further inquiry into ankle bracelets was not necessary until there was a due process violation was because the court did not believe that ankle bracelets would fundamentally change the nature of the release conditions which were already available for the court to impose. Instead, the court viewed the ankle bracelets as added insurance that if the court imposed house arrest and a defendant violated that condition, the violation would be detected and his bond would be revoked. Defendants appealed the court's denial of their

---

1. In their renewed motion for release defendants argued that, given the conditions at the MCC, they could not adequately prepare for trial and therefore they were being deprived of their Sixth Amendment right to effective assistance of counsel. The court rejected this conten-

tion, finding that the special arrangements made for the *Infelise* detainees at the MCC were adequate to allow defendants to prepare for trial. *See* Memorandum Opinion and Order, January 2, 1991 at 9–10.

renewed motion for release, and the Seventh Circuit remanded the case for the court to determine "whether the use of anklets would satisfy the Bail Reform Act and thereby give these defendants a statutory entitlement to release pending trial." *United States v. Infelise, et al.*, 934 F.2d 103, 105 (7th Cir.1991).

On June 4, 1991, the court held a hearing on the operation and availability of the electronic surveillance devices. Mr. Robert Fowler, Supervisor of the Pretrial Services Office, testified that the ankle bracelet is installed on the defendant in the defendant's home. The anklet transmits a constant radio frequency to the Guardian Company, which is located in Ohio. The court then designates who Guardian will contact if there is a violation (i.e., if Guardian stops getting the radio transmission). Because there is only one pretrial services officer available who works an eight-hour shift, it is clear that some other federal law enforcement agent and the local police departments in the defendants' neighborhoods would have to be contacted by Guardian if there was a violation. Although local police departments have apparently been used as contacts for the electronic monitoring of defendants in state custody, neither Mr. Fowler nor anyone else testified as to whether any local police

have ever been used for federal defendants or whether particular local police departments would be willing to participate in the instant case.

Mr. Fowler further explained that the electronic surveillance system has only been used for seven defendants in federal cases in the Northern District of Illinois.[2] Of those seven defendants, one was deemed to be a violator of the system. According to the government, the "violator" tried to enlist the help of someone to make a wax impression of the lock on the ankle bracelet, but the person whose help the defendant tried to enlist reported the incident to the government.[3] Mr. Fowler stated that of the seven defendants who have been placed on the system, some were pretrial detainees and some had already been convicted of crimes and were awaiting sentencing. One of the defendants on the system was indicted for arson, several were involved in drug crimes and some were alleged to be (or found to be) felons in possession of guns. None of the seven defendants placed on the system had been accused of homicide.

In response to a question posed by the government, Mr. Fowler testified that the success of the ankle bracelets is largely dependent upon who is selected to wear the

2. Defense counsel made much of the fact that although the system is new to the Northern District of Illinois, it is not a new technology. Defense counsel contended that because the system has been in operation in other jurisdictions for about five years, the "kinks" have been worked out. However, defense counsel presented little concrete factual support. One defense attorney pointed to the statistics contained in *United States v. O'Brien*, 895 F.2d 810, 815–16 (1st Cir.1990). Yet, the *O'Brien* case only dealt with percentages of people who fled while on the bracelets and provided no information on whether those who were on the system because of dangerousness committed other types of violations. In fact, the *O'Brien* court stated that "the statistics are incomplete. The proportion of those using the bracelet because of the danger they pose to the community relative to the number using the bracelet because they present a risk of flight is not yet available." *Id.* at 816, n. 9. Moreover, even if defendants had presented evidence that the system has been successful for these types of defendants in other jurisdictions, this would only be of limited relevance because the defendants would be released in the

Northern District of Illinois, not in any other jurisdiction.

3. The government argued that the detained defendants would also try to devise ways to negate the effectiveness of the bracelet because they are the type of people who try to "beat the system." In support, the government stated that the Title III recordings of the defendants show that they are knowledgeable about the grand jury system and how long a person can be detained for refusing to testify before the grand jury. However, the government did not provide specific citations to the Title III materials which illustrate this contention. Similarly, the government argued that defendant Infelise has tried to "beat the system" by using family members to pass messages and "hush money," but the government did not cite to any tapes or testimony to corroborate this allegation. Because the government did not provide sufficient evidentiary support, the court did not consider the government's argument that the detained defendants would try to "beat the system" when ruling on this motion.

device. As Magistrate Judge Gottschall noted during a hearing to determine whether a defendant in a different case should be placed on the system,[4] the electronic surveillance devices are "reactive systems" and "they don't prevent anybody from doing anything." *See* Transcript of Proceedings Before Magistrate Judge Gottschall, Attached to Government's Response to Defendants' Second Supplement, at 46. "All they do is give us notice when something has happened." *Id.* The court agrees with this analysis. Defendants that are placed in this program must be chosen carefully. Although defendants correctly argue that this program is designed for defendants who need stringent supervision, not all defendants who need stringent supervision can be allowed out on bond using the ankle bracelet. The court must examine each defendant individually to determine whether an ankle bracelet, alone or in combination with other conditions, can adequately protect witnesses and the community from a defendant who is found to be dangerous.

Defense counsel, while advocating the viability of house arrest with ankle bracelets, pointed out that defendants Marino and Salerno have been confined to house arrest and have not violated the conditions of their release. However, the government presented much less evidence of dangerousness against defendants Marino and Salerno at the initial detention hearings than they presented against the detained defendants. In fact, that is why the court released defendants Marino and Salerno on bond in the first place. Moreover, defendant Nicholas, who the government did not move to detain without bond, was released on bond and was subsequently arrested for violations of state gambling laws.[5] In short, the court finds that the behavior of some defendants released on bond is not a reliable indicator of how other defendants will conduct themselves if they are released on bond.

Defendants also argue that house arrest with ankle bracelets is adequate to negate defendants' dangerousness because defendants are willing to allow the government to monitor their phones without securing Title III authorization. In the court's first opinion, the court stated that "[t]he manpower necessary to conduct effective surveillance of the defendants' homes and/or phone conversations would be extraordinary given the number of defendants involved and the expected length of time before this case goes to trial." *See* Memorandum Opinion and Order, May 15, 1990 at 10. However, defendants maintain that without having to secure Title III authorization, the government could employ much less manpower to monitor defendants' phones. With a Title III wiretap, the government is required to minimize its intrusion on the defendants and can only listen to certain types of calls. When a call is made or received that the government is not allowed to listen to, the wiretap must be disengaged. Also, with a Title III wiretap the government must keep a written log of relevant calls. Defendants argue that with a voluntary wiretap, all the manpower necessary to minimize intrusion and to log calls would be eliminated. However, a voluntary phone tap serves no purpose unless someone listens to the calls. Therefore, a tremendous amount of manpower would still be needed to listen to calls, even if the listening did not have to be edited or recorded.

Furthermore, the court has already authorized the government to monitor the calls of the four defendants the court released on bond pursuant to its May 15, 1990 order. Thus, the government would have to dispatch people to listen to some or all conversations of four to eight defendants, twenty-four hours a day, seven days a week for the next eight or nine months. Similarly, if the monitoring of the surveil-

---

**4.** This is the only other hearing on the use of electronic monitoring in this district of which the court is aware.

**5.** Defendant DiDomenico was also released on bond and was subsequently indicted on an extortion charge. Although Mr. DiDomenico was

acquitted of the extortion charge, the parties are briefing the issue of whether there is probable cause to believe that Mr. DiDomenico was engaging in gambling in violation of his bond conditions.

lance bracelets could not be worked out with local police departments, at least four federal agents would have to be available twenty-four hours a day, seven days a week for the next eight to nine months to respond to a notice of violation from the Guardian company. This too is an enormous commitment of manpower to a system which cannot prevent a bond violation but can only assist in reporting it.

The court finds that the case at bar is distinguishable from *United States v. Gatto*, 750 F.Supp. 664 (D.N.J.1990), cited by the Seventh Circuit in *United States v. Infelise, et al.*, 934 F.2d 103, 105 (7th Cir. 1991). In *Gatto*, the New Jersey District Court re-evaluated the detention of three defendants who had been held pretrial for 15 months on grounds of dangerousness. The *Gatto* court found that continued detention of defendants would violate due process and released defendants on very stringent conditions. However, one critical difference between this case and *Gatto* is that after the *Gatto* court re-evaluated the government's evidence, it decided that the government's evidence on the defendants' dangerousness was "less substantial" than the evidence of defendants' gambling activities and that it "appears to be stale in many instances." *Gatto*, 750 F.Supp. at 674. The court added that the "[d]efendants would not have been detained on the evidence of their involvement in an illegal gambling business alone." *Id.* In contrast, in the instant case, the court is still convinced that the government presented ample evidence of defendants' dangerousness at the initial detention hearings and defendants did not show that the government's evidence has become stale or insubstantial.

In fact, in their renewed motion for release pending trial, defendants presented evidence to refute the court's initial finding of defendants' dangerousness. Defendants maintained that the government had concealed certain exculpatory tape-recordings during the detention hearings and that this exculpatory evidence showed the court's finding of dangerousness was erroneous. The court carefully reviewed defendants' evidence and still found defendants to be dangerous. The Seventh Circuit did not disturb this finding on review and nothing has been presented to compel the court to review this issue a third time.

In sum, after taking further evidence and hearing further argument on the use of an electronic surveillance system, the court finds that defendants should remain in custody pending trial. The evidence presented on the operation and effectiveness of the electronic monitoring system available in this district was inconclusive at best. Furthermore, even if the system was foolproof, it alone would not be sufficient to protect witnesses and the community from these defendants. The electronic surveillance would have to be supplemented by house arrest, twenty-four hour a day phone monitoring, and twenty-four hour a day availability of law enforcement agents to respond to an electronic monitor violation. The government was not certain that such an enormous commitment of manpower could even be obtained for the next eight to nine months. Moreover, this is not a case of defendants' right to effective assistance of counsel being placed in jeopardy because of a lack of government resources. As noted in the court's January 2, 1991 order, the detained defendants have been given a private room in the MCC in which they can listen to tapes with their attorneys, and they have access to the room 40.5 hours per week, including time at night and on weekends. The court finds there is a limit to the amount of government resources which have to be expended to release dangerous defendants pretrial, when their constitutional rights are not being violated by continued detention. Thus, the court holds that there are no conditions or combination of conditions which will reasonably assure the safety of witnesses and the community and orders the defendants detained pending trial.