**UNITED STATES, Appellant,**

v.

**Edward O'BRIEN, Defendant, Appellee.**

No. 89–2033.

United States Court of Appeals,
First Circuit.

Heard Dec. 6, 1989.
Decided Feb. 5, 1990.

Robert L. Ullmann, Asst. U.S. Atty., with whom Wayne A. Budd, Boston, Mass., was on brief, for appellant.

Owen S. Walker with whom Susan L. Crockin Boston, Mass., was on brief, for defendant, appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.

COFFIN, Senior Circuit Judge.

Defendant Edward O'Brien was a high-ranking federal drug agent for 18 years. He was arrested on August 14, 1989 in a government "sting" operation, and indicted for trafficking in cocaine in violation of 21 U.S.C. §§ 841 and 846. The day after his arrest, O'Brien appeared before a magistrate and the government moved for his pretrial detention pursuant to 18 U.S.C. § 3142(f)(1) and (2).[1] The magistrate ordered him detained because of a serious risk of flight. After further hearings, however, the magistrate ordered O'Brien released on the conditions that he wear an

---

1. Those sections provide in relevant part:

   (f) **Detention Hearing.**—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of the person as required and the safety of any other person and the community—

   (1) upon motion of the attorney for the Government, in a case that involves—

   .    .    .    .    .

   (C) an offense for which the maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), . . .; or

   .    .    .    .    .

   (2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves—

   (A) a serious risk that the person will flee; or

   (B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness or juror.

   18 U.S.C. § 3142(f)(1) and (2).

electronic monitoring bracelet[2] and that he post as security the Virginia home in which he lived. The district court affirmed the magistrate's decision, but added two further conditions: O'Brien would report daily by telephone to the pretrial services office and random unannounced visits would be made to his home by pretrial services officers. Believing the defendant still posed an unacceptable risk of flight, the government appealed the district court's decision to this court. We affirm.

The decision concerning O'Brien's detention was made after lengthy hearings over several months. In her first memorandum and order, issued on August 28, 1989, the magistrate ordered O'Brien to be detained because he presented a serious risk of flight.[3] In making her decision, the magistrate considered the defendant's personal characteristics, including his understanding of the inner workings of law enforcement, his proximity to an international airport, the fact that he had international connections from having worked in France for five years, and his present emotional and financial problems. In addition, she pointed out that the government's case was strong and included a confession from the defendant. She commented that while he might have a defense of outrageous government conduct or entrapment, this defense required reliance on his emotional and financial vulnerability, factors which had contributed to her perception that he posed a risk of flight.

After weighing all the factors, she found that based on the record at that time no conditions or combination of conditions of release would reasonably assure his appearance. She stated, however, that if the defendant could demonstrate that the electronic bracelet is effective to prevent flight and is available where the defendant lives, she would find that he had met his burden of rebutting the presumption of flight. The defendant moved for reconsideration of the order based on evidence of the effectiveness of the electronic bracelet. The magistrate then found that the bracelet was "an effective technology for notifying Pretrial Services and the United States Marshal's office promptly when a defendant has fled. Further, it appears to deter a defendant from attempting to flee." In balancing all the factors considered in her earlier memorandum as well as the evidence concerning the bracelet, the magistrate found that a combination of conditions existed that could reasonably assure his appearance: the use of the electronic bracelet coupled with the posting of the home in Herndon, Virginia in which he lived with his new wife.

The defendant moved to substitute other surety for the Herndon home, including two properties owned in part by different brothers. He argued that the Herndon home belonged to his wife and had never been offered or available to him. He stated that his wife was unwilling to post the home because of an informal agreement with her former spouse that the equity would be held in "moral trust" for her children; she was reluctant to post the home without her ex-husband's approval, which was not forthcoming. O'Brien also claimed that a government lien on the property would hamper further its marketabili-

---

**2.** The magistrate described the electronic monitoring bracelet as follows:
> The electronic bracelet is a device which straps around a defendant's ankle, and is screwed on with a special screwdriver which can not be duplicated. Any effort to cut the bracelet or tamper with it is immediately detected by a computer at Guardian [Technologies, Inc.], which provides not only the equipment but the monitoring system to the Pretrial Services Office for the Eastern District of Virginia.
> With the electronic bracelet on, defendant can go anywhere within 150 feet of the monitoring computer, which is hooked into a telephone in the house, and which transmits sig-

nals to a "host computer" in Cincinnati, Ohio. If defendant goes beyond the 150–foot range, a warning signal goes off. After two minutes, a signal is sent to the Guardian host computer, and a Guardian employee calls the responsible pretrial services officer, who is on a 24–hour beeper system.
Further Memorandum and Order Re: Detention at 3 (Sept. 19, 1989).

**3.** She also found at this time that the government had failed to demonstrate that O'Brien presented a danger to any other person or the community. The government has not pursued this ground for detention.

ty at a time when sale of the asset was critical. The magistrate rejected this proposed substitution, finding that there were inadequate indications that the defendant's connection to the other properties was sufficient to assure his appearance; she also found that the need for the asset was the very factor that made it good security. The defendant sought reconsideration, and, after an additional hearing concluded with the same result, appealed to the district court the requirement of posting the Herndon home. The district court upheld the magistrate's refusal to accept other security, stating that there were no other conditions or combination of conditions at that time that would reasonably assure defendant's appearance.[4]

Ten days later, the defendant offered the Herndon home as surety, and the magistrate ordered O'Brien released. She denied a government request for a hearing on the defendant's alleged misrepresentations concerning the availability of the Herndon residence as surety. She further ordered defense counsel to inform the court when Mrs. O'Brien could sign bail papers and attend a hearing concerning her willingness and capacity to serve as third-party custodian.

Following the district court's affirmance, with the added conditions noted *supra* at 3, the government appealed and sought a stay of release from this court. The stay was granted and an expedited appeal was ordered.

On appeal, the government asserts that no evidence before the court supported a finding that the electronic bracelet deterred flight and the bracelet therefore could not constitute a condition rebutting the presumption of flight. In addition, the government contends that it was improperly denied a hearing to contest the value of the Herndon home as surety.

## I.

We first consider our scope of review. The issue has been touched upon but never clearly decided in this circuit since the Bail Reform Act of 1984 was enacted. Prior to that time, Congress specifically had provided that in pretrial detention decisions an order "shall be affirmed if it is supported by the proceedings below." 18 U.S.C. § 3147(b)(2) (repealed). No standard was articulated in the earlier act for decisions concerning release after conviction, 18 U.S.C. § 3148 (repealed), and courts typically applied an independent review. *See, e.g., United States v. Provenzano*, 605 F.2d 85, 93 (3d Cir.1979). After 1984, however, all detention decisions have been governed by the same statutory provision, 18 U.S.C. § 3145(c), which provides no standard of review.

In a decision following closely on the heels of the Act, this court indicated in passing that the standard for review was whether the order on appeal was "supported by the proceedings below." *United States v. Jessup*, 757 F.2d 378, 387–388 (1st Cir.1985). The court relied on cases citing the earlier statute and did not refer to or analyze the new statute. In *United States v. Bayko*, 774 F.2d 516, 520 (1st Cir.1985), we held that post-conviction detention decisions should be given an independent review with deference to the findings of the district court. We noted in dictum in *Bayko*, 774 F.2d at 518 n. 3, that it was no longer clearly appropriate to apply a different standard of review to pretrial detention decisions, but we made no such holding. We now address the question not reached in *Bayko*, and find that the standard of review for pretrial detentions is the same.

The circuits have split concerning the standard of review for detention decisions under § 3145(c). Some courts have held that the district court's decision must be reviewed under the clearly erroneous or other highly deferential standard. *See*

---

**4.** The government contends that the district court held that no conditions or combination of conditions existed *at all* that would assure defendant's appearance. The government therefore asserts that all subsequent actions taken by the magistrate were without authority. We have no transcript with which to resolve this dispute, but take the defendant's version to be true based on the subsequent actions of the district court in affirming the magistrate's later rulings.

*United States v. Fortna,* 769 F.2d 243, 250 (5th Cir.1985) (supported by the proceedings below); *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir.1985) (clearly erroneous); *United States v. Williams,* 753 F.2d 329, 333 (4th Cir.1985) (clearly erroneous). Most circuits, however, have applied an independent review with some deference to the district court's determination.

Two distinct formulations of the independent standard have been used. Some courts have determined that the appellate court should give an independent review to questions of law and mixed questions of fact and law, but a clearly erroneous review to the factual findings of the district court. *See United States v. Hurtado,* 779 F.2d 1467, 1470–1472 (11th Cir.1985); *United States v. Maull,* 773 F.2d 1479, 1487 (8th Cir.1985); *United States v. Motamedi,* 767 F.2d 1403, 1406 (9th Cir.1985); *United States v. Hazime,* 762 F.2d 34, 37 (6th Cir.1985). Others, including this court in *Bayko,* 774 F.2d at 520, have held that review under § 3145(c) should be independent but should give deference to the district court's determination. *See also United States v. Portes,* 786 F.2d 758, 762 (7th Cir.1985); *United States v. Delker,* 757 F.2d 1390, 1399–1400 (3d Cir.1985).

As other circuits have noted, the two independent standards are roughly equivalent, despite their apparent differences. *See, e.g., Portes,* 786 F.2d at 762; *Hurtado,* 779 F.2d at 1471. As a practical matter, deference to the determination of the trial court in the context of an independent review typically will mean giving the greatest deference to purely factual determinations.[5] We therefore consider whether an independent or highly deferential standard best reflects congressional intent for pretrial detention decisions.

We have reviewed the decisions of those courts that have held that the standard is clear error, and we are not persuaded that they adequately address the responsibilities

of this court. In *Fortna,* 769 F.2d at 250, the Fifth Circuit provided little analysis, but relied heavily on our dicta in *Jessup,* the continuing vitality of which is at issue here. In addition, the *Fortna* court had recent precedent, *United States v. Golding,* 742 F.2d 840, 841 (5th Cir.1984), which it was reluctant to abandon. Moreover, in ruling that detention decisions were subject to a narrow review, the court expressly held that the standard should be the same for both pretrial and post-conviction decisions, a conclusion with which we concur. Unlike the Fifth Circuit, however, we have clear precedent that post-conviction decisions are subject to an independent review. The *Fortna* decision, therefore, provides little help to us. The other two circuits that apply the clearly erroneous standard do so without analysis. *Chimurenga,* 760 F.2d at 405; *Williams,* 753 F.2d at 333.

Despite this lack of analytical support, we recognize that there are good reasons for giving deference to a district court's determinations in this situation. Pretrial detention decisions are made after hearings specifically authorized under 18 U.S.C. § 3142(f), and the district court's decision should therefore be a considered one. We think it would unduly intrude on the ability of district courts to render these decisions on a day to day basis if they were subjected to cavalier treatment by an appellate court with little experience or opportunity to develop expertise. In addition, the requirement that district courts "state in writing the reasons for the action taken," Fed.R.App.P. 9(a), "suggests that the courts of appeals are not free to ignore a trial judge's supporting statement of reasons for his or her actions." *Delker,* 757 F.2d at 1400.

These considerations, however, may be adequately accounted for by deference to the district court's factual findings and conclusions in the context of an independent review. In addition, an independent review

---

5. We think, however, that the second formulation is less artificial, as it does not attempt to divide the universe of trial court determinations into categories of purely factual and mixed questions. *Compare Hurtado,* 779 F.2d at 1472 (describes which statutory factors considered by the trial court are factual and which are mixed), *with United States v. Maull,* 773 F.2d at 1487 (determination of what is a purely factual question requires a case by case review).

accords with Congress' apparent intent, to the extent that we can ascertain it.

While there is little legislative history suggesting the appropriate standard of review, the Senate Report states that the procedures for appeals are those "set forth in Rule 9 of the Federal Rules of Appellate Procedure." S.Rep. No. 225, 98th Cong., 1st Sess. at 29 n. 92 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News at pp. 3183, 3212 n. 92. Rules 9(a) and 9(b) (which treat pre-conviction and post-conviction detention appeals, respectively) permit an appellate court to consider materials not before the district court in determining the appropriateness of a detention order.[6] We think it significant that prior to the passage of the new bail provisions, Congress undoubtedly was aware that a circuit court had interpreted this language to indicate an independent review for post-conviction detention decisions. *Provenzano,* 605 F.2d at 93.

Moreover, since passage of the Act, this court has concluded that Rule 9 continues to be some evidence that Congress intended an independent review in the context of post-conviction detentions. *Bayko,* 774 F.2d at 519. In the absence of a different statutory standard of review, the language of Rule 9 would appear to have the same significance for *pre*-conviction detentions.

In addition, at the same time it changed the review provisions, Congress added a new section allowing the government to appeal district court detention determinations, 18 U.S.C. § 3731. The legislative history of that provision indicates that it was designed to "vindicate the 'clear public interest in permitting review of release orders which may be insufficient to prevent a defendant from fleeing or committing further crimes.'" *Bayko,* 774 F.2d at 519 (quoting S.Rep. No. 225, 98th Cong., 1st

Sess. at 30 (1983), *reprinted in* 1984 U.S. Code Cong. & Admin.News 3213). This additional purpose lends some force to the idea that Congress meant to unify both pre- and post-conviction review under a single independent standard when it eliminated the statutorily provided standard for pretrial decisions.

Finally, "[a]n independent determination by the appellate court would seem appropriate in light of the nature of the question to be determined. A crucial liberty interest is at stake." *Delker,* 757 F.2d at 1399. The nature of the interest, coupled with Congressional recognition that appeal from such orders should be prompt,[7] reinforces our conclusion that a more searching review than our customary examination for clear error is in order.

Accordingly, we adopt for pretrial detention orders the review standard we set forth in *Bayko,* 774 F.2d at 520, for post-conviction detentions, despite our language in *Jessup,* 757 F.2d at 387–388. We conclude that Congress intended the appellate courts to independently review all detention decisions, giving deference to the determination of the district court. If upon careful review of all the facts and the trial judge's reasons the appeals court concludes that a different result should have been reached, the detention decision may be amended or reversed. If the appellate court does not reach such a conclusion— even if it sees the decisional scales as evenly balanced—then the trial judge's determination should stand.

## II.

■ Under 18 U.S.C. § 3142(e), Congress has established a rebuttable presumption that no conditions or combination of conditions exist that will reasonably assure a defendant's appearance where there is

---

**6.** The precise language in both rules is that the determinations shall be made "upon such papers, affidavits, and portions of the record as the parties shall present." Fed.R.App.P. 9(a) and 9(b). The Third Circuit held in *United States v. Provenzano,* 605 F.2d 85, 92 (3d Cir. 1979), that this language enabled an appellate court to consider evidence not before the district court.

**7.** 18 U.S.C. § 3145(c) provides:

An appeal from a release or detention order, or from a decision denying revocation or amendment of such an order, is governed by the provisions of section 1291 of title 28 and section 3731 of this title. *The appeal shall be determined promptly.*

(Emphasis added.)

probable cause to believe that "the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)." As this court previously has held, the presumption serves to shift the burden of production and to require that the defendant introduce "some evidence" to the contrary. *United States v. Jessup*, 757 F.2d 378, 381 (1st Cir.1985). The government retains the burden of proving that no conditions will reasonably assure the defendant's appearance. *Id.* The presumption, however, does not cease to have effect once the defendant has come forward with some evidence. Instead, it continues to operate as one factor to be considered by the court in determining whether the defendant must be detained. *Jessup*, 757 F.2d at 383.

Recognizing the presumption, the magistrate found at the initial hearing that the defendant posed a serious risk of flight and that the presumption had not been overcome by any evidence then before the court. She specifically stated, however, that if the bracelet could be demonstrated to be an effective device for preventing flight, she would find that the presumption had been overcome and that conditions existed that would reasonably assure the defendant's appearance. The question before us is whether the evidence eventually presented constitutes an adequate rebuttal of the presumption and, if so, whether the total weighing of factors supports defendant's release.

Evidence on the effectiveness of the electronic bracelet came from a variety of sources. The court heard testimony from Carolyn Ortwein, the chief United States Pretrial Services officer in Alexandria, Virginia and Daniel Ryan, the Chief of the Program Services Branch of the Administrative Office of the United States Courts. The defendant also presented an affidavit from the national manager of Guardian Technologies, Inc., the supplier of the bracelet. The government submitted an

affidavit concerning its own survey of the effectiveness of the bracelet in other districts and an assessment by a marshal in the Eastern District of Virginia who thought defendant's chance of fleeing was "pretty good" given the proximity of the defendant's residence to Dulles airport.

The evidence reveals the following facts. First, the pretrial services office in Alexandria, Virginia has the funding to use the electronic bracelet, but has never before supervised a defendant released with the bracelet. Moreover, the office itself is new and, at the time of the magistrate's decision, O'Brien would have been only the second person supervised by the office. Ortwein, however, has had substantial experience in pretrial services. She supervises five pretrial officers. The officer who would be responsible for O'Brien was a probation officer for six years prior to his appointment to this position.

The bracelet itself has been used in fourteen districts to date, with about 200 defendants. Since the magistrate's decision, another judge in the District of Massachusetts has authorized its use. Five persons have fled while on the bracelet.[8] Two were caught within a week, one is believed to have been killed, and the others were never caught. Some of the 200, including one who fled, were monitored by a passive bracelet that is less effective than the active bracelet involved here.

These figures indicate that about two and one half percent of those with the electronic bracelet have fled. The national figure for those who flee of all those released is three to four percent. While the magistrate found this to be a significant difference, we do not think that, given the low numbers involved, a statistically relevant difference can be claimed at this time, though anecdotally the evidence has some force. We agree, however, with the magistrate's observation that the fact that the number is lower at all is noteworthy: those released with a bracelet would typically

---

8. *The defendant points out that the figure actually testified to was* four. *If true, this number would lower the percentage of those with the bracelet who have fled; the statistical significance of the difference between the numbers who flee with the bracelet and those fleeing without it might also be improved.*

include a higher number of persons posing a risk of flight than the general population of defendants, because the bracelet would be used only where the defendant would otherwise be detained based on the risk of flight or danger to the community.[9]

We conclude that the evidence concerning the effectiveness of the bracelet alone only arguably rebuts the presumption of flight. The magistrate, however, did not rely entirely on the bracelet in finding that O'Brien had rebutted the presumption. She also considered the availability of a surety which, by all appearances, is so vital to defendant that he sought hard and long to avoid offering it. We think that this evidence as a whole is sufficient to rebut the presumption.

The remaining question is whether the court correctly determined, based on all of the facts in this case and giving continuing weight to the presumption, that a combination of conditions existed that reasonably would assure defendant's appearance. In reviewing the decision below, we shall also consider whether due attention was given to all the statutory factors.[10] Finally, we shall give such deference as we think the care and consideration manifested by the magistrate and district court warrant. Applying that deference to the findings of both the magistrate and the district court, we affirm the decision below.

The defendant without doubt presents a risk of flight with or without the presumption. The emotional and financial difficulties he is experiencing make his actions less predictably rational. He undoubtedly has connections abroad because he worked in France for five years. If he is inclined to flee, O'Brien is sophisticated in the practices of enforcement agencies and may have an increased likelihood of successfully doing so.

We therefore accept the magistrate's conclusion that the defendant's poor financial and emotional condition may increase his propensity to flee. On the other hand, O'Brien's very indigence inhibits his ability to travel far. While the government's case against O'Brien is strong, he has a potential defense that could exonerate him and that will be undercut by fleeing. Although he may know people in France, he has not lived or worked there since 1979, and we have been presented with no evidence that his ties there remain close. Moreover, there is no evidence that the international drug dealers he brought to justice or enforcement officers with whom he worked are the type of connections considered by Congress when creating the presumption, i.e. drug connections who will wish to harbor and financially support him. *See* S.Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), *reprinted in* 1984 U.S.Code Cong.

9. Admittedly, the statistics are incomplete. The proportion of those using the bracelet because of the danger they pose to the community relative to the number using the bracelet because they present a risk of flight is not yet available. The government also asserts that the statistics are incomplete because the proportion who are charged with drug offenses is not available. We believe, however, that the relevant comparison group is the number who present risks of flight for any reason. And the fact remains that the number who flee is quite small.

10. The factors to be considered by the trial court in making detention decisions are set forth by statute:

The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

(1) The nature and circumstances of the offense charged, including whether the of-

fense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release....

18 U.S.C. § 3142(g).

& Admin.News 3203; *Jessup*, 757 F.2d at 385. In addition, despite the fact that as a former Drug Enforcement Administration (DEA) agent he may have inside information that could assist him to escape, the decision here is consistent, as the magistrate was aware, with the cases of three other DEA agents who have been arrested on various charges during the past year, all of whom have been released pretrial.

O'Brien is also married. In addition, as the magistrate noted, from the time of his initial arrest, he has expressed concern about his daughter. Detention Memorandum and Order at [unnumbered] 11 (August 28, 1989). Despite the seriousness of the offenses alleged in the instant case, the defendant has had a distinguished law enforcement career and has not been involved in prior offenses. It is true, however, that his current marriage is recent and that he has only moved to Virginia in the last year after many years in the Springfield, Massachusetts community.

Our review of all of the factors shows that the judgment is a close one. We think that the magistrate fully considered all of the factors required by statute. Her decision was made with obvious care after many hours of hearings. The district court concurred after reviewing the magistrate's findings carefully (evidenced by the imposition of additional conditions). Applying some deference to the determinations of the courts below, we conclude that the government has not met its burden of showing that no condition or combination of conditions will reasonably assure O'Brien's appearance. We therefore affirm his release on the conditions set forth by the district court.

### III.

■ The government makes one final assertion of error. It claims that because O'Brien consistently maintained that the Herndon home was unavailable as surety, the government was denied the opportunity at earlier hearings to challenge the appropriateness of this property as security and Mrs. O'Brien's ability to influence the defendant to appear. The government contends that O'Brien's earlier representations were misleading and that it was entitled to a hearing to prove actual misrepresentation. The magistrate denied a hearing on the alleged misrepresentation, but, in her order of release, ordered that Mrs. O'Brien appear at a hearing to determine her ability and willingness to serve as a third-party custodian.

The government's claim that it is entitled to a hearing rests on the case of *United States v. Nebbia*, 357 F.2d 303 (2d Cir. 1966). *Nebbia* concerned a defendant who repeatedly had claimed to be unable to post bail of $100,000. Only a few hours after the last denial of his motion to reduce bail, the defendant presented a cashier's check in the full amount. The government requested a hearing concerning the sudden availability of this surety. The district court found that, as a matter of law, it was precluded from conducting a hearing once the set condition had been met. In *Nebbia*, the Second Circuit held that "the mere deposit of cash bail is not sufficient to deprive the court of the right to inquire into other factors which might bear on the question of the adequacy of the bail and stress the importance placed upon the ability of the surety to produce the defendant." 357 F.2d at 304. The court remanded to the district court to "take such action as in his discretion he may find to be justified." *Id.* at 305.

Thus, *Nebbia*, while authorizing a hearing if the trial court determines one is appropriate, does not support the government's contention that it was entitled to such a hearing. Courts have continued to hold hearings as necessary. *See, e.g., United States v. $250,000 in United States Currency*, 808 F.2d 895, 898 (1st Cir.1987). But the government provides no authority for its claim to a hearing as a matter of right.

We decline to require a district court to hold a hearing every time the government requests one where a defendant has met the conditions set by the court for release. Moreover, the magistrate has in fact premised defendant's release on a future hearing at which Mrs. O'Brien's capacity and

willingness to serve as a third-party custodian will be raised. Thus, the government's claim that it was not able to raise questions about her ability to influence the defendant's appearance is premature. Nor did the court, as the government contends, refuse to allow questioning on the issue of whether Mrs. O'Brien has somehow been made whole in advance for the loss of the property should the defendant choose to flee. Instead, the magistrate merely refused to conduct a hearing into the defendant's alleged misrepresentations. It remains open to the magistrate, in her sound discretion, to allow questions concerning the continuing importance of the property to Mrs. O'Brien in the event of defendant's flight.

*Affirmed.*