**UNITED STATES of America, Appellant,**

v.

**Raymond J. PATRIARCA,
Defendant, Appellee.**

**No. 91–1638.**

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1991.

Decided Oct. 28, 1991.

---

James D. Herbert, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Jeffrey Auerhahn, and Gregg L. Sullivan, Asst. U.S. Atty., Boston, Mass., were on brief, for appellant.

Martin G. Weinberg, with whom Oteri Weinberg & Lawson, Kimberly Homan, Zalkind, Sheketoff, Wilson, Homan, Rodriguez & Lunt, Boston, Mass., and John F. Cicilline, Providence, R.I., were on brief, for defendant, appellee.

Before TORRUELLA, Circuit Judge, HILL,\* Senior Circuit Judge, and SELYA, Circuit Judge.

TORRUELLA, Circuit Judge.

According to the government, defendant-appellee Raymond J. Patriarca is the former Boss of the New England Mafia Family bearing his name (although named after his father).[1]  Patriarca assumed leadership of the Patriarca Family following the death of his father in July 1984 and held it until he was demoted following his indictment in this case.  That indictment, handed down on March 22, 1990, charges Patriarca with two counts under RICO, 18 U.S.C. § 1962,- and five counts of violating the Travel Act, 18 U.S.C. § 1952.  The Travel Act violations also serve as predicate acts for the RICO charges.

The government moved for pretrial detention under the Bail Reform Act, 18 U.S.C. §§ 3142(e) and (f), contending that no condition or combination of conditions would reasonably assure Patriarca's appearance at trial and the safety of the community.  The magistrate did not rule on risk of flight, but did hold that only

---

\* Of the Eleventh Circuit, sitting by designation.

1. For a brief description of the operations of the Mafia, *see United States v. Tortora,* 922 F.2d 880, 882 n. 2 (1st Cir.1990).

pretrial detention would ensure public safety. More than one year later, following additional hearings, the district court ordered Patriarca's release. 776 F.Supp. 593 (1991). The government appeals that order. With one reservation, we agree with the district court that the government has failed to meet its burden of proof. As to that reservation, we remand to the district court for further proceedings.

### Standard of Review

■ Our review of the district court's release order is not *de novo*, but, rather, independent, "giving deference to the determination of the district court." *United States v. O'Brien*, 895 F.2d 810, 814 (1st Cir.1990). Independent review is

> tempered by a degree of deference to the determinations made below. Recognizing that appellate courts are ill-equipped to resolve factbound disputes, this standard cedes particular respect, as a practical matter, to the lower court's factual determinations. Hence, independent review represents an intermediate level of scrutiny, more rigorous than the abuse-of-discretion or clear-error standards, but stopping short of plenary or *de novo* review.

*United States v. Tortora*, 922 F.2d 880, 882–83 (1st Cir.1990).

In *Tortora*, as here, a magistrate originally ordered that the defendant be detained pretrial, but the district court ordered his release. Unlike the case before us, however, the district court in *Tortora* made no findings of fact beyond those found by the magistrate, accepted the magistrate's finding of dangerousness, and gave no exegesis for the release order, providing little or nothing for us to defer to. *See id.* at 888; *see also O'Brien*, 895 F.2d at 816 (we give only "such deference as we think the care and consideration manifested by the magistrate and district court warrant"). As a result, this court vacated the release order and reinstated the magistrate's earlier order.

Here, by contrast, we have a "cohesive explanation" of the district court's decision. *See Tortora*, 922 F.2d at 884. Under this posture we can make an effective—independent—determination of whether the conditions of release reasonably assure the safety of the community and the appellee's presence at trial.

■ As to the method by which we make this determination, our cases establish the procedure. We first decide whether we agree with the district court that the government proved that the defendant poses a danger to the community and/or a risk of flight. *Id.* If this inquiry indicates that the defendant presents no danger to the community and no risk of flight, then the defendant can be released on personal recognizance or unsecured appearance bond as prescribed in 18 U.S.C. § 3142(b). If, however, there is some risk, we proceed to evaluate the conditions to see if they will serve as a reasonable guard. *Tortora*, 922 F.2d at 884; *O'Brien*, 895 F.2d at 816.

### Dangerousness

The magistrate's detention order was based primarily on two conclusions drawn from subsidiary facts: first, that Raymond Patriarca's membership in the Mafia indicated a continuing commitment to a criminal way of life; second, that the evidence against Patriarca was strong, since a substantial portion of it consisted of his own tape-recorded words. The district judge did not specifically dispute either of these conclusions and agreed that they militated in favor of detention. But the court did not end its inquiry there. Instead, the judge conducted his own analysis of appellee's situation in light of the statutory factors set forth in 18 U.S.C. § 3142(g). His findings follow.

(1) *Nature and circumstances of the offense.* Patriarca is charged with two RICO violations and five Travel Act violations. The court noted that at least two of the Travel Act violations related to extortion and credit transactions, which are crimes of violence, 18 U.S.C. § 3156(a)(4)(A), thus triggering the detention determination called for by 18 U.S.C. § 3142(f)(1)(A). On the other side of the balance, the court found that appellee was not charged with any personal acts of violence, nor with ob-

struction of justice, nor with any narcotics offense. The RICO charges rested essentially on appellee's leadership role in the Mafia, but the government had stipulated that Patriarca no longer held that position. Moreover, if convicted of the charges, the guideline sentence would be in the range of only five to six years, absent departure.

(2) *Weight of the evidence.* The judge found that the evidence that Patriarca was the Boss of the Patriarca Family was strong, but characterized the evidence on the Travel Act violations as of uncertain weight. He also found significant the fact that all the evidence was documentary; there were no testimonial witnesses, thus no one for appellee to threaten if he were to be released.

(3) *History and characteristics of the defendant.* The judge noted that Patriarca has strong family ties; legitimate employment as a real estate developer; no history of drug or alcohol abuse; a rational demeanor and an apparent ability to act in his own, enlightened, self-interest. Patriarca suffers from recurrent bladder cancer and requires hospitalization every three months. Importantly, he has no criminal record. The court found, though, that the absence of a record was at least in part because Patriarca's position as Boss allowed him to rely on others to commit substantive crimes. The court characterized Patriarca as a reluctant and ineffective Mafia Boss, one who achieved his position by virtue of nepotism rather than merit. He had never been a strong leader and his power had diminished substantially, to the point where, in the summer of 1989, an underling had threatened to kill him if he did not step down. In response, Patriarca ceded considerable power to this individual. The court acknowledged that appellee had presided at a Mafia induction ceremony at which the inductees swore lifelong loyalty to the Mafia, and promised to kill any informants if instructed to do so. But, the

judge also found that "no one is likely to order this defendant to kill anybody. He has no penchant or personal aptitude for violence."[2] Finally, Patriarca had been demoted from Boss, largely because the organization held him responsible for allowing the FBI to tape the induction ceremony. His tenuous status within the Mafia made it unlikely that he would be called upon to assist his replacement.

In sum, the facts as found by the district court indicate that Patriarca did not have a clean slate despite his lack of a criminal record. Nevertheless, the court found the evidence that Patriarca was so dangerous that no set of conditions could assure the safety of the community to be short of clear and convincing. *See* 18 U.S.C. § 3142(f) (imposing a clear and convincing burden on the government to prove dangerousness). Essentially, the judge found that although *in theory* a Mafia Boss was an intimidating and highly dangerous character, the government had not demonstrated that *this Boss* posed a significant danger, or at least not a danger that could not be overcome given appropriate conditions.

We cannot disagree with that conclusion. It was rendered after substantial consideration, by a judge with a great deal of familiarity with the case. The dangerousness inquiry thus shifts to the adequacy of the conditions imposed by the court. But first, we look at the district court's findings as to risk of flight.

### Risk of Flight

The district court applied a similar analysis in evaluating the risk that Patriarca would flee rather than appear for trial. Significant here were appellee's ties to his family, making it unlikely that he would leave them (and jeopardize their homes under the forfeiture condition). Further, appellee's poor health rendered flight dangerous. If Patriarca escaped but was captured, he would likely face a substantial

---

**2.** To be sure, danger to the community does not refer only to the risk of physical violence. *See Tortora,* 922 F.2d at 884 (citing S.Rep. No. 225, 98th Cong., 2d Sess. 4–12, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3187–95). The comments of the trial judge indicate that he was well aware of this fact, and that he also considered the possible danger flowing from the continuing commission of crime and from assistance Patriarca might lend to his successor in the organization.

upward departure in his sentence. Given Patriarca's health, the judge noted that a longer term of imprisonment would amount to a sentence to die in prison. The court also found that, although Patriarca had known for some time that he was under FBI surveillance, he did not flee. He had appeared before several grand juries when subpoenaed. And he stayed put when confronted with rampant rumors of his imminent indictment.

On the other side of the flight risk equation, the court acknowledged that the Mafia had both the will and the way to facilitate flight. The Patriarca Family (the government argued that it was Patriarca himself) had once assisted a fugitive's flight by supplying him with $100,000 cash; however, the court found that the government had not tied appellee personally to that episode. Moreover, as Patriarca no longer commanded significant power or respect in the organization, the court believed that he was not likely to receive support from the Mafia were he to flee.

Overall, the court found that the evidence of the likelihood of Patriarca's flight was minimal, not even enough to satisfy the preponderance burden of proof. *See United States v. Jackson,* 823 F.2d 4, 5 (2d Cir.1987) (holding that the preponderance standard applies to the flight determination). The court's determination, while perhaps not inevitable, seems a supportable exercise of its factfinding function. The most compelling consideration—the Mafia's ability to aid flight—is not supplemented by evidence of *this Mafia member's* propensity to flee. Therefore, the adequacy of the conditions to assure appellee's presence at trial becomes relevant.

### Adequacy of the Conditions

The district court devised an innovative and extensive group of conditions for appellee's release. In addition to the stock provisos, *see* 18 U.S.C. § 3142(a), the court required that Patriarca shall:

(1) remain in his home 24 hours a day subject to electronic monitoring, except that he may leave his home for medical appointments and medical emergencies in the custody of one of his attorneys;

(2) meet and/or communicate directly or indirectly only with his attorneys and individuals approved by the court, defendant being required to keep a record of his direct and indirect communications;

(3) at his own expense, install and maintain 24-hour video camera surveillance directed at each entrance to his house;

(4) have only one telephone and one telephone line at his residence;

(5) execute an agreement to forfeit $4 million, collateralized by real estate held in the name of his wife and certain other relatives, upon a determination by the court that he has violated a condition of his release and that forfeiture should result;

(6) be subject to unannounced searches (of the defendant, his residence, and his visitors) by agents or officers of the FBI, Pretrial Services or by other law enforcement agencies.

These conditions were devised to provide assurance against both aspects of the Bail Reform Act inquiry, danger to the community and risk of flight, and we find ourselves (with one reservation detailed below) unable to disturb the district court's conclusion that they suffice. First, Patriarca agreed that the forfeiture condition (number (5) above) would take effect upon the violation of any condition of release. This agreement, essentially a private contract, was intended to avoid the uncertainty noted in *Tortora* as to whether under the Bail Reform Act forfeitures only apply to failure to appear at trial. *See id.* at 886 n. 8; *see also* 18 U.S.C. § 3142(c)(B)(xi). We see no reason why such an agreement should not be valid and it adds considerably to the incentive value of the forfeiture condition.[3] Without such a provision, forfeiture tends

---

3. At least one court has upheld bail forfeiture for breach of the defendant's promise not to break the law. *See United States v. Vaccaro,* 719 F.Supp. 1510, 1513 (D.Nev.1989), *appeal dismissed,* 931 F.2d 605 (9th Cir.1991). The *Vacca-* ro court rationalized that Rule 46(e), Fed. R.Crim.P., authorizing forfeiture of bail for any breach of condition, continued to exist in harmony with the Bail Reform Act.

to be more effective against risk of flight than against danger to the community. *See Tortora*, 922 F.2d at 886 n. 8.

Second, the judge explicitly disclaimed reliance on Patriarca's good faith compliance, a fatal weakness of the conditions imposed in *Tortora. Id.* at 886–87. This disclaimer has two parts. One is the video monitoring system which serves as an objective check on appellee's behavior. The other is the judge's explicit finding that Patriarca would comply because compliance was in his enlightened self-interest. Based on his assessment of Patriarca's ability to perceive the consequences of his own conduct, the judge considered the risk of forfeiture, the danger to Patriarca's health, and the possibility of a substantial upward departure at sentencing to be adequate assurance of compliance—wholly apart from good faith.

Third, appellee is financing the elaborate video monitoring system himself, and the other conditions are not extraordinarily burdensome to the government. The government is thus not going to "heroic measures," nor is it establishing a private jail at public expense. *See Tortora*, 922 F.2d at 887.

Taken together, we find the conditions are within the district court's "legal power to create and to impose a kind of 'pre-trial house arrest.'" *See id.* at 895 (Breyer, J., concurring). We cannot say these conditions do not provide reasonable assurance of public safety and of appellee's attendance at trial.

In urging us to vacate the release order, the government relies heavily on *Tortora*, claiming that as both Carmen Tortora and Raymond Patriarca are members of the Patriarca Family, they are painted with the same brush and merit the same treatment. *Tortora* itself provides our response: "De-

tention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant." 922 F.2d at 888. And a comparison of the two cases reinforces the need for individualized analysis. The district court here gave careful consideration to the relevant statutory factors, considered new evidence, and provided us with a careful summary of its conclusions, all absent in *Tortora.* Carmen Tortora had a long criminal record; Raymond Patriarca has none. Tortora was a parole violator, had a penchant for violence, and no evidence pointed to his debilitation (or rehabilitation). Moreover, there was, in Tortora's case, a specific factual finding that he was likely to violate any conditions of release. Here, the court found just the opposite with respect to Patriarca. And here, in the interval between the magistrate's detention order and the district court's release order, a significant event occurred: Patriarca's demotion from his role as Boss of the Family. The two cases provide a vivid example of the error of lumping defendants together based solely on their alleged Mafia membership. They also demonstrate the nature of independent review, which can vary in intensity according to the care put into the decision below. We do not find the cases sufficiently comparable to change the result here.[4]

■ As we insinuated above, we do have one reservation related to the forfeiture condition. The Bail Reform Act provides that release conditions may include the requirement that the defendant:

> execute an agreement to forfeit upon failing to appear as required, *such designated property, including money, as is reasonably necessary to assure the ap-*

---

**4.** Further distinctions can be drawn between the release conditions imposed upon the two defendants. Tortora was to be allowed to leave his home unaccompanied to visit his doctors and lawyers; Patriarca's lawyers must come to him, and they must accompany him to his doctor's appointments. Tortora was to be allowed to meet with co-defendants in the presence of counsel; Patriarca is forbidden to do so under any circumstances. Tortora was to post only

one house, belonging to his brother, and the forfeiture may have taken place only upon Tortora's failure to appear; Patriarca will post significantly greater assets and has agreed to forfeiture for any violation. It does not appear that Tortora consented to random searches; Patriarca has done so. The video monitor is unique to Patriarca. Again, we find that comparing the two cases supports, rather than undermines, our holding here.

*pearance of the person as required,* and post with the court such indicia of ownership of the property or such percentage of the money as the judicial officer may specify.

18 U.S.C. § 3142(c)(1)(B)(xi) (emphasis added). Plainly contemplated by this language is some exploration of a defendant's assets or net worth. Without such information we fail to see how a judicial officer could arrive at a forfeiture amount which would reasonably assure compliance. In *O'Brien,* for example, the court was persuaded to release the defendant in part because the proposed surety was "so vital to defendant that he sought long and hard to avoid offering it." 895 F.2d at 816; *see also United States v. DiGiacomo,* 746 F.Supp. 1176, 1190 (D.Mass.1990) (requiring defendant to put all his assets up for forfeiture). By contrast, it appears here that the $4 million worth of real estate was freely offered up by Patriarca, and the record does not suggest what portion of appellee's worth the forfeiture represents. As the forfeiture provision is a crucial release condition, its effectiveness will be bolstered (or its inadequacy revealed) by additional factfinding on this point. For that purpose we shall remand the case to the district court.[5]

### Conclusion

Membership in, and leadership of, a Mafia Family are undoubtedly "highly relevant considerations" in the pretrial detention analysis. *Tortora,* 922 F.2d at 885 n. 10; *DiGiacomo,* 746 F.Supp. at 1182. But mention of the Mafia is insufficient, in itself, to carry the day for the government, and we decline to disturb the district court's considered assessment that the oth-

er factors do not prove that Raymond Patriarca is such a danger to the community, or such a risk of flight, that no reasonable set of conditions on his release is conceivable.[6] We are, however, concerned with the process by which the amount of property to be forfeited was determined. For that reason, we remand to the district court for further findings as to appellee's financial position.

*Remanded.*

HILL, Senior Circuit Judge (concurring *dubitante*).

I concur in our judgment ordering a remand for additional factfinding on net worth. I concur in so much of the opinion and judgment approving the denial of pretrial detention because I feel especially deferential to the district judge's findings and conclusions.

I am troubled, nevertheless, by the direction we have taken and are taking. The appellee has not been tried under the indictment. When and if he is he will be entitled to the presumption of innocence and to a jury properly instructed on the burden of proof placed on the prosecution. However, we are given a record, on the question of pretrial detention, *vel non,* which identifies appellee as a committed member of La Cosa Nostra, pledged to do its bidding. That, alone, would substantiate a finding that he presents a danger of flight; he will flee if his sovereign tells him to flee and his master, La Cosa Nostra, may be endangered by disclosures at his trial.

But that finding was not made by the district court.

---

**5.** We wish to emphasize that the evidence here was certainly sufficient to allow the trier to reach a contrary conclusion and order that Patriarca remain in pretrial detention. But as mentioned earlier, the independent review standard contemplates a certain deference to factbound determinations made by the district court. In our view, this deference must carry the day in the case at bar.

**6.** The government has submitted to this court, under seal, additional evidence which it contends demonstrates the need to detain Patriarca before his trial. (Fed.R.App.P. 9(a) permits this

court to consider new evidence in a pre-conviction detention appeal). We have reviewed this material and appellee's response to it, and conclude that it does not alter the analysis. Although some of the documents may arguably add to the weight of evidence against appellee, they do not show that he is a risk of flight or a danger to the community. The same applies to a recent memorandum and order issued by the United States District Court for the District of New York in the case *United States v. John Gotti,* 776 F.Supp. 666 (E.D.N.Y.1991), also called to our attention by the prosecutor in this case.

I am troubled by the weight given to the finding that Patriarca can and will pay for much of the technologically exotic surveillance of himself. We must not announce that, in this country, a financially successful hood whose gotten gains permit him to imprison himself in comfort need not put up with our prison system, but one apprehended before the accumulation of great wealth will not be due our deference.

The ability of the defendant to pay should have nothing to do with the decision as to whether pretrial release conditions constitute the "heroic measures beyond those which can fairly be said to have been within Congress's contemplation" to which we referred in *U.S. v. Tortora,* 922 F.2d 880, 887. The district court should first decide, without reference to who pays, whether the measures to be employed are within the meaning of 18 U.S.C. § 3142(c)(1). If they are, the court may also consider imposing the cost upon the defendant, but I suggest that they cannot be found to be within the contemplation of the Act *because* the defendant can afford to pay for them.[1]

Had the district court found that pretrial detention was required, I have little doubt that its imposition would have received my concurrence.

Leaning heavily upon the better opportunity the district judge has had to evaluate the witnesses, and agreeing with the remand ordered, I concur.

---

1. Perhaps I am too alarmed at the prospect of our making arrangements with criminals along the lines of those made in another country to accommodate a drug cartel leader whose extradition to this country was sought.