USCA1 Opinion

 

 March 14, 1995 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1118 UNITED STATES, Appellee, v. CHARLES R. ROGERS, JR., Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, Chief U.S. District Judge] _________________________ ____________________ Before Torruella, Chief Judge, ___________ Selya and Boudin, Circuit Judges. ______________ ____________________ David N. Cicilline on brief for appellant. __________________ Sheldon Whitehouse, United States Attorney, and Lawrence D. ___________________ ____________ Gaynor, Assistant United States Attorney, on brief for appellee. ______ ____________________ ____________________ Per Curiam. This is an appeal from the denial of a __________ motion to revoke an order of pretrial detention. On December 14, 1994, defendant/appellant Charles Rogers, Jr. and codefendants Ruben DeLeon, David Scialo, and Andrew J. Beagan were charged in a two-count indictment with: (1) conspiring to distribute and possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. 841(a)(1) and 846, and (2) attempting to possess with intent to distribute said cocaine in violation of the aforementioned statutes and 18 U.S.C. 2. After the defendants were arraigned and a detention hearing was held on December 16, 1994, a magistrate judge ordered that all the defendants be detained pending trial. Rogers subsequently filed a motion to revoke that detention order.1 The district court heard evidence, proffers, and arguments on this motion on December 20 and 22, 1994. At the conclusion of the proceedings the district judge issued an oral ruling that denied Rogers' motion to revoke the detention order on the ground that Rogers posed a risk of flight. Five days later the magistrate judge issued a form pretrial detention order which noted, inter alia, that clear _____ ____ and convincing evidence had established that Rogers  ____________________ 1. While the magistrate judge ordered that all the defendants be detained at the conclusion of the detention hearing on December 16, 1994, he did not issue a written order at that time. The transcript of the proceedings before the magistrate judge is not before us. -3- participated in a conspiracy to distribute cocaine, that he faced at least 10 years' imprisonment if convicted, and that he had not rebutted the presumption that he posed a risk of flight or danger to the community under 18 U.S.C. 3142(e).2 On January 17, 1995, the district court entered a one- sentence order denying Rogers' motion to revoke the magistrate judge's detention order. This appeal followed. For the reasons set out below, we affirm. I. BACKGROUND _____________ The record discloses that the defendants were arrested following a "sting" arranged by agents of the Federal Bureau of Investigation (FBI) and the Providence Police Department.3 On November 16, 1994, undercover Providence  ____________________ 2. 18 U.S.C. 3142(e) governs detention of defendants pending trial. The statute provides, in pertinent part, that: Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.),.... 3. The events that lead to Rogers' arrest are detailed in the "Alternative Findings" appended to the magistrate judge's detention order. As the district judge left these findings undisturbed in denying Rogers' motion to revoke, we rely on these findings and the government's proffer at the district court's 12/20/94 hearing in describing the evidence of the underlying offense. -4- Police Detective Fred Rocha met defendant Andrew Beagan in Providence. Beagan indicated that he wanted to purchase cocaine. Rocha agreed to sell Beagan 25 kilograms of cocaine at a price of $13,500 per kilogram. Rocha told Beagan he would get the cocaine around the end of the month. On December 8, 1994, Rocha told Beagan that he had the cocaine. They agreed that Rocha would be paid in large bills and that the transaction would occur on December 12, 1994. They further agreed that the transaction would be done in two stages. First, Beagan and Rocha would meet and Beagan would show Rocha the money. Rocha would then call the people that Beagan was working for by cellular telephone and tell them where they could retrieve the cocaine. Beagan's people would then drive to the site of the cocaine and, upon verifying that the drug was there, call Beagan and tell him to release the money to Rocha. At approximately 10:30 a.m. on December 12th Rocha met Beagan to finalize the plans for the trade. They agreed that the transaction would take place at about 4:00 p.m. Ten kilograms would be delivered first, and if Beagan's people were satisfied with the drug's quality, the remaining fifteen kilograms would be exchanged within an hour. Beagan told Rocha that he had a rental car that he wanted to use as the "drop car" for the cocaine. Rocha agreed. Around 1:30 p.m. Rocha had a telephone conversation with Beagan. Rocha told -5- Beagan to bring the "drop car" to the parking lot at University Heights in Providence. Beagan agreed and informed Rocha that the "drop car" was a white Taurus with plate #VU- 690. Rocha told Beagan to leave the keys in the visor. Shortly thereafter Rocha and another undercover officer found the Taurus in the University Heights parking lot. The Taurus was driven to another location where its trunk was loaded with a mixture of cereal and plaster designed to resemble cocaine. The Taurus was then parked in a lot next to a baseball field on Gano Street in Providence. The agent who left it there put its keys on the visor. At approximately 3:45 p.m. Detective Rocha telephoned Beagan from a hotel parking lot in Providence. They agreed that Beagan would meet him there with the money for the cocaine. Rocha told Beagan to tell the person who was going to pick up the cocaine to wait at another restaurant for instructions. Beagan arrived approximately fifteen minutes later with codefendant DeLeon. DeLeon exited his vehicle (a Geo) and entered Rocha's vehicle with a leather bag. He opened the bag and showed Rocha bundles of five and ten thousand dollars.4 DeLeon then returned to his Geo and Rocha began to give Beagan directions to the Taurus. At that point Beagan got a telephone call on the cellular telephone that  ____________________ 4. It was later determined that the bag contained $145,000.00. -6- was in the Geo. Beagan then asked Rocha to direct the person on the other end of the line to the Taurus. Rocha spoke on Beagan's cellular telephone and told the person on the other end of the line to enter the parking lot near the intersection of Power and Gano Streets.5 Rocha then sat waiting in his car with DeLeon. Minutes later FBI and Providence Police agents saw a Toyota with three occupants enter the parking lot where the Taurus had been planted. The Toyota drove up to the Taurus. Defendant David Scialo exited the Toyota and entered the Taurus, taking its keys from the visor. The Toyota and the Taurus were then driven towards Gano Street. As these vehicles were departing defendant Rogers was seen driving the Toyota and holding a cellular telephone to his ear. The agents then stopped the vehicles and arrested Rogers, Scialo, and Juan Toribio (the third occupant of the Toyota).6 Beagan and DeLeon were arrested at the hotel where they had met Rocha. Further investigation later disclosed that defendant Scialo had rented the Taurus that had been used as the "drop car" on December 2, 1994. Rogers was listed as a second driver on the rental agreement. At the district court's hearing on Rogers' motion to revoke the detention order Rogers presented evidence of his  ____________________ 5. The government proffered that the person on the other end of the line was referred to as "Chuck", asserting that Rocha spoke to the defendant, Charles Rogers. 6. The government elected not to prosecute Toribio. -7- strong family and community ties. Thus, the record discloses that Rogers is thirty years old and has been a lifelong resident of Rhode Island. While Rogers never married, he is the father of a ten-year old daughter. Rogers' uncle, Gary Saucier, testified that Rogers has a "very loving and caring relationship" with his daughter. Saucier was willing to post his residence as security and to supervise Rogers if he was released.7 Defense counsel also proffered that Rogers had no prior convictions although certain state charges that had been pending against Rogers had been dismissed that morning.8 Defense counsel maintained that the evidence against Rogers was weak because the government had shown simply that Rogers had dropped off another defendant (Scialo) and immediately departed, it had not adduced any evidence that Rogers had any knowledge of a drug deal. Defense counsel argued that given the weak state of the evidence, the absence of prior convictions, Rogers' significant family ties and lack of resources to flee, pretrial release with conditions was justified.  ____________________ 7. Rogers offered to submit to numerous conditions if released, including third-party custody with his aunt and uncle and electronic monitoring. He also offered to post a surety bond secured by his uncle's real estate. 8. The state charges included conspiracy to violate a controlled substances act, possession with intent to distribute marijuana, delivery of over one ounce of cocaine, possession with intent to distribute cocaine, and a firearms offense. -8- In contrast, the prosecutor argued that the case against Rogers was strong, stressing that the evidence would show that Rogers was the person that agent Rocha spoke to on the cellular telephone when he gave directions to the Taurus and that Rogers was seen holding a cellular telephone to his ear as he drove the Toyota away from the pick-up site (thus suggesting that Rogers had been communicating with the other alleged conspirators by cellular telephone). The government also submitted a pretrial services report that recommended that Rogers be detained pending trial because his record raised concerns about his reliability to appear in court. The report indicated that Rogers had violated the conditions of his release on the aforementioned state drug charges since he had not reported to the Rhode Island State Bail Information/Supervision Unit (the "bail supervision unit") since July 1994. The report further indicated that the bail supervision unit sent Rogers three separate notices of his violation and that he had not responded to any of the notices.9 The pretrial services report concluded that  ____________________ 9. The notices were sent to Rogers on September 1, 1994, November 16, 1994, and December 13, 1994. The first two notices were sent to Rogers at 361 Williams Street, Providence, the address that Rogers reported as his residence for the past 18-24 months when he was interviewed by the federal probation officer on December 13, 1994. The last notice was sent to a previous address that Rogers had given to the state bail supervision unit. Each notice stated: As part of your bail conditions, you are to be in contact with the Bail Information Unit office. -9- Rogers had demonstrated an unwillingness to comply with the state court's bail release conditions.10 The district judge indicated that the information in the pretrial services report concerning Rogers' failure to respond to the bail supervision unit's notices was important evidence that weighed against pretrial release. Defense counsel maintained that Rogers had never received any of the notices due to a miscommunication occasioned by the closing of Rhode Island's bail supervision unit. The court recessed the hearing to allow defense counsel to investigate the matter further. When the hearing reconvened on December 22, 1994, defense counsel reported that Rogers had lived at three different addresses over the last two-and-a-half years and that his current address was 365 Williams Street (not the 361 _ _ Williams Street address that Rogers had given to the federal probation officer and the Rhode Island bail supervision unit). Defense counsel maintained that Rogers simply did not receive the notices, that he otherwise had a good record of  ____________________ Since we have not heard from you, you may be in violation of your bail conditions. Please call us immediately at 277-3827. If we do not hear from you a warrant will be issued for your arrest. 10. The report also indicated that although Rogers had formerly worked for his father's plumbing business, he had been unemployed for approximately nine months when he was arrested on the instant federal charges. -10- complying with the requirements of his state probation, and that Rogers was an excellent candidate for pretrial release. At the conclusion of the hearing on December 22, 1994 the district judge announced that there was evidence that Rogers was involved in the purchase of approximately $140,000 worth of cocaine, that the procedures used to accomplish the exchange were professional in nature, and that Rogers participated in picking up the cocaine. The judge further noted that Rogers was subject to a mandatory 10-year sentence if convicted and that it was not likely to have been just happenstance that Rogers was driving the Toyota from which the pick-up man alighted. The judge specifically found that Rogers was given notice that a warrant would issue for his arrest if he did not report to the state bail supervision unit. While Rogers claimed that he did not receive these notices, the district judge found that either was not true or Rogers was not living at the address he had given to the probation department.11 The judge denied Rogers' motion, indicating that, "there is the possibility of flight here."  ____________________ 11. We note that it appears to be undisputed that Rogers did not receive the third, 12/13/94, notice from the bail supervision unit as he was arrested and detained for the federal offenses on December 12, 1994. However, the first two notices were sent to 361 Williams Street, the address which Rogers had identified as his. It is also undisputed that Rogers' father and step-mother reside at 361 Williams Street. -11- II. DISCUSSION ______________ On appeal, Rogers argues that the district judge placed too much emphasis on the pretrial services report's information concerning his failure to respond to the Rhode Island bail supervision unit's notices. He reiterates his contention that the case against him is weak because the government offered no evidence that he knowingly participated in a plan to purchase cocaine. Rogers maintains that his strong community ties and other personal characteristics establish that he does not pose a risk of flight or danger to the community. We afford a pretrial detention order independent review with deference to the findings of the district court. See ___ United States v. O'Brien, 895 F.2d 810, 814 (1st Cir. 1990). ______ ______ _______ This is "an intermediate level of scrutiny, more rigorous than the abuse of discretion or clear-error standards, but stopping short of de novo or plenary review." United States __ ____ _____________ v. Tortora, 942 F.2d 880, 883 (1st Cir. 1990). We determine _______ whether "due attention was given to all the statutory factors [governing pretrial release under 18 U.S.C. 3142(g) and] ... shall give such deference as we think the care and consideration manifested by the magistrate [judge] and -12- district court warrant." United States v. O'Brien, 895 F.2d _____________ _______ at 816.12 Having reviewed the record thoroughly, we decline to disturb the district court's ruling.13 The indictment established probable cause to believe that Rogers had violated the Controlled Substances Act and was punishable by a maximum of at least 10 years' imprisonment. See, e.g., ___ ____ United States v. Vargas, 804 F.2d 157, 163 (1st Cir. 1986). _____________ ______ Thus, under 18 U.S.C. 3142(e), the district court was required to presume that no condition(s) would reasonably  ____________________ 12. Under 18 U.S.C. 3142(g), district courts determining whether pretrial release is warranted must consider such factors as the nature of the offense charged, the weight of the evidence against the defendant, the defendant's personal history and characteristics (including the defendant's family and community ties, employment, financial resources, criminal history, and record of court appearances), whether the defendant was on probation or other release pending trial at the time of his arrest, and the nature of any danger that would be posed by the defendant's release. 13. We note that the district judge only issued oral findings and did not reduce his decision to writing as required by 18 U.S.C. 3142(i)("In a detention order issued pursuant to ... subsection (e), the judicial officer shall - (1) include written findings of fact and a written statement of the reasons for the detention;..."). In the past we have regarded this as a basis for remand. See, e.g., United ___ ____ ______ States v. Moss, 887 F.2d 333, 338 (1st Cir. 1989)(remanding ______ ____ where detention order contained only conclusory statement that defendant failed to rebut 18 U.S.C. 3142(e) presumption). However, as of December 1, 1994, Fed. R. App. P. 9(a) allows district courts to, "state in writing, or __ orally on the record, the reasons for an order regarding ______________________ [pretrial] release or detention of a defendant in a criminal case." (emphasis supplied). As the district judge stated his reasons for detaining Rogers orally on the record, we are able to conduct the necessary review. -13- assure Rogers' appearance at trial or the safety of the community absent sufficient rebuttal evidence from Rogers. Here, Rogers submitted evidence that he had strong ties to Rhode Island, no significant criminal record, and a willingness to submit to various conditions of release. While Rogers' evidence satisfied his burden of production, see, e.g., United States v. Jessup, 757 F.2d 378, 384 (1st ___ ____ _____________ ______ Cir. 1985)(defendant need only produce "some evidence" to rebut presumption), the presumption did not simply disappear upon the presentation of Rogers' evidence. See, e.g., United ___ ____ ______ States v. Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988). ______ ____________ Rather, the district judge was required to consider the congressional presumption that drug traffickers generally pose special risks of flight along with the other factors outlined in 18 U.S.C. 3142(g) in determining whether pretrial detention was warranted. Id. ___ The judge's oral findings indicate that he gave due consideration to the nature of the offense charged, the weight of the evidence against Rogers, and Rogers' personal history and characteristics when he determined that the government had carried its burden of persuasion that Rogers posed a risk of flight. In particular, the judge found that the government had demonstrated that Rogers participated in a professional conspiracy to purchase a large amount of cocaine that was worth a substantial sum of money. Contrary to -14- Rogers' contention, we do not agree that the evidence against Rogers was weak. The government proffered that Rogers was the person to whom agent Rocha spoke when he gave directions to the Taurus that purportedly contained the cocaine. Minutes after Rocha gave these directions, Rogers was seen dropping off defendant Scialo at the pick-up site and holding a cellular telephone to his ear as he drove away followed by the Taurus. The fact that Rogers was seen with a cellular telephone, the mode of communication that Beagan and Rocha agreed upon when they hatched the scheme to transfer the drugs and money at separate locations, further suggests that Rogers was in on the deal. While this evidence is admittedly circumstantial, "criminals rarely welcome innocent persons as witnesses to serious crimes ...." United States v. Ortiz, _____________ _____ 966 F.2d 707, 712 (1st Cir. 1992), cert. denied, 113 S. Ct. _____ ______ 1005 (1993). Thus, we think that the district judge reasonably inferred that this combination of events indicated that Rogers was a knowing participant in a conspiracy to purchase cocaine. See United States v. Sanchez, 917 F.2d ___ ______________ _______ 607, 610 (1st Cir. 1990), cert. denied, 499 U.S. 977 (1991), _____ ______ (conspiracy may be inferred from a development and collocation of circumstances). We also reject Rogers' contention that the district judge erred by placing too much weight on the information in the pretrial services report concerning Rogers' failure to respond to the Rhode Island -15- bail supervision unit's notices. The record discloses that two of the notices were sent to the address that Rogers identified as his home (i.e., 361 Williams Street) when he was interviewed by the federal probation officer on December 13, 1994.14 When Rogers' failure to respond to these notices became an issue, defense counsel proffered that Rogers resided at a different address (i.e., 365 Williams Street) and that he never received the notices. But where Rogers had reported that his address was 361 Williams Street only one week earlier, we think that the district judge was justifiably skeptical of Rogers' claim that he did not receive the notices that had been sent to that address in September and November 1994.15 Moreover, although Rogers proffered that he lived at 365 Williams Street, there was no evidence that he ever gave the bail supervision unit this address. Thus, we think that the judge's conclusion that Rogers either received the state's notices and failed to respond to them, or failed to report his correct address to  ____________________ 14. An addendum to the pretrial services report further indicates that Rogers had given the same address to Rhode Island's bail supervision unit. 15. The pretrial services report indicates that Rogers reported that he had resided with his father and step-mother at 361 Williams Street for approximately two years, and that Rogers' father corroborated this assertion. If that were true, Rogers should have received the notices that were sent to him in September and November of 1994. -16- the bail supervision unit, was reasonable.16 In any event, the record indicates that the district judge had good cause to doubt Rogers' future compliance with any conditions of release that might be imposed. It is true that there was no direct evidence that Rogers participated in the negotiations for the purchase of cocaine between Rocha and Beagan. However, given the significant circumstantial evidence that Rogers participated in the conspiracy, the evidence that he had violated the conditions of release with respect to previous state charges, and the fact that Rogers faces a substantial penalty if convicted, we agree with the district court's conclusion that the presumption that Rogers presents a risk of flight has not been overcome. This case is similar to United States v. ______________ Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991). There we ______ affirmed the detention of a defendant who, like Rogers, had no significant prior convictions and had not participated in the negotiations for the purchase of drugs. Dillon, however, had appeared with a substantial sum of money ($200,000) at the time of the illicit exchange. Thus, he appeared "to be part of an organization with significant financial  ____________________ 16. To be sure, we recognize that the state charges that lead to the imposition of these reporting requirements were ultimately dismissed in December 1994. However, the pretrial services report indicates that Rogers stopped reporting to the bail supervision unit without justification in July 1994, five months before the charges were dismissed. -17- resources[,]" i.e., the type of drug organization that Congress had in mind when it enacted 18 U.S.C. 3142(e). See ___ United States v. Dillon, 938 F.2d at 1416; United States v. _____________ ______ ______________ Jessup, 757 F.2d at 385-86. While Rogers was not the money ______ man, he nonetheless appears to be affiliated with an organization that was able to finance a purchase of $140,000 worth of cocaine. Such an organization could no doubt finance Rogers' flight. In short, the record as a whole indicates that Rogers failed to adduce sufficient evidence to rebut the presumption that he poses a risk of flight.17 Accordingly, the district court's order denying Rogers' motion to revoke the order of pretrial detention is affirmed. _________  ____________________ 17. As the district court supportably rested its decision on risk of flight grounds, we need not consider the issue of dangerousness. Cf. United States v. Jessup, 757 F.2d at 380. ___ _____________ ______ -18-